**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

LEVI FARREN MILLER,

               Defendant.

No. 19-cr-2031-LTS

**REPORT AND RECOMMENDATION
ON DEFENDANT'S REQUEST FOR
A *FRANKS* HEARING, MOTION TO
SUPPRESS, MOTION TO DISMISS,
AND SECOND MOTION TO
DISMISS**

_____

**TABLE OF CONTENTS**

                                                                       **Page**

*I.*     *INTRODUCTION* ........................................................................ **4**

*II.*    *FINDINGS OF FACT* ................................................................. **4**

      *A.*    *Officers Bovy and Payne's Initial Contact with Ms. Latham's Daughter and the Daughter's Aunt at 1005 West Mullan Avenue* ...................5

      *B.*    *Officers Bovy and Payne's Contact with Ms. Latham and Defendant's Neighbor, Emmitt Johnson* ........................................................5

      *C.*    *Law Enforcement Contact with Defendant, Ms. Miller, and Ms. Randall* ...........................................................................6

      *D.*    *Police Interview with Ms. Latham* .............................................8

      *E.*    *Police Interview with Mr. Cole* .................................................9

      *F.*    *Police Interview with Ms. Cole* ............................................... 11

      *G.*    *Police Interview with Ms. Borntreger* ....................................... 12

H.     Search of 1005 1/2 West Mullan Avenue and Subsequent Arrest of Defendant ........................................................................... 13

I.     Conclusions from the Bureau of Alcohol, Tobacco, Firearms and Explosives Regarding the Shotgun Seized at 1005 1/2 West Mullan Avenue ...................................................................................... 15

III.     ANALYSIS .................................................................................. 15

A.     Defendant was not entitled to a Franks hearing. ....................... 15

     1.     Standard of Review for Determining Whether Defendant is Entitled to a Franks Hearing ............................................ 17

     2.     Officer Bovy did not intend to mislead the issuing judge or act with reckless disregard for the truth when he mistakenly stated in the application that he spoke with Ms. Borntreger and Ms. Cole. ................................................................. 18

     3.     Officer Bovy's omissions do not constitute a substantial preliminary showing that Officer Bovy intended to mislead the issuing judge or acted with reckless disregard as to whether the application would mislead the issuing judge. ...................... 20

     4.     The alleged false statement was not necessary to the issuing judge's finding of probable cause, and the omitted information was not clearly critical to the issuing judge's finding of probable cause. ..................................................................... 24

     5.     Conclusion ................................................................ 27

B.     The Court should not suppress evidence seized inside Defendant's residence. ................................................................................ 27

     1.     Exigent circumstances justified entry into Defendant's residence. ................................................................. 28

        a.     Officer Safety ....................................................... 29

        b.     Destruction of Evidence .......................................... 30

2

        *c.*     *The inevitable discovery doctrine is applicable because law enforcement did not exploit their presence in the residence* ....................................................31

   **2.**    **The shotgun was properly seized pursuant to the search warrant.** ........................................................ 33

   **3.**    **Law enforcement's seizure of the shotgun was justified under the plain-view doctrine.** ........................................ 35

   **4.**    **The search warrant sufficiently described Defendant's residence.** ................................................................. 36

**C.**    **Issues Regarding the Short-barreled Shotgun**............................. 37

   **1.**    **26 U.S.C. Section 5845(a)(1) and 18 U.S.C. Section 921(a)(6) provided Defendant fair notice.** ....................................... 38

   **2.**    **The Second Amendment does not protect Defendant's possession of a short-barreled shotgun.** .......................................... 40

   **3.**    **The United States Supreme Court has found the National Firearms Act Constitutional.** .......................................... 41

**D.**    **The Government has no duty to present exculpatory evidence at a grand jury proceeding.** ................................................................. 41

**IV.**   **CONCLUSION** ......................................................................42

## I.    INTRODUCTION

The matters now before me are Defendant's Motion to Suppress and Request for *Franks* Hearing, Motion to Suppress, Motion to Dismiss, and Second Motion to Dismiss. (Docs. 11, 12, 14, and 17).  The Government timely filed its responses.  (Docs. 30, 32, 33, and 34.)  On May 8, 2019, the Grand Jury charged Defendant with Possession of a Firearm by a Felon in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2) and Possession of a National Firearms Act Short-Barreled Shotgun Not Registered to Possessor in violation of 26 U.S.C. Sections 5841, 5861(d) and 5871.  (Doc. 2.)  The charges arose from a search of his residence pursuant to a warrant issued by the Honorable Joel Dalrymple, District Court Judge of the Iowa District Court.

The Honorable Charles J. Williams, United States District Court Judge, referred these motions to me for a Report and Recommendation.  On October 7, 2019, I held an evidentiary hearing on Defendant's motions.  The Government called Waterloo Police Officer Jeremy Berryman ("Officer Berryman"); Waterloo Police Officer Alexander Bovy ("Officer Bovy"); Waterloo Police Officer Steven Thomas ("Officer Thomas"); and Waterloo Police Officer Joseph Saunders ("Officer Saunders").  Defendant called no witnesses, and instead offered videos and documents.  Following the hearing, each party timely submitted a supplemental brief.  (Docs. 55 and 56.)

For the following reasons, I respectfully recommend that the Court deny all Defendant's motions.

## II.    FINDINGS OF FACT

This case involves Defendant's alleged possession of a short-barreled shotgun. Defendant's neighbor, Takeela Latham, called law enforcement to report Defendant possessing a shotgun and yelling at Ms. Latham for removing items from her porch and placing them in Defendant's truck.  (Gov. Ex. 1 at 4.)  Ms. Latham claimed Defendant pointed the shotgun at her and Jarrell Cole, after which she and Mr. Cole ran back into

Ms. Latham's apartment. (*Id.*) Officer Alexander Bovy, a police officer with the Waterloo Police Department, was the first to respond to the call regarding the alleged confrontation between Ms. Latham and Defendant. Defendant resided in the upstairs apartment of 1005 West Mullan Avenue in Waterloo, Iowa. (Bovy Oct. 7, 2019 Hr'g Test.) Ms. Latham and her daughter resided on the ground floor of the same residence. (Gov. Ex. 1 at 4.)

**A.** **Officers Bovy and Payne's Initial Contact with Ms. Latham's Daughter and the Daughter's Aunt at 1005 West Mullan Avenue**

Officer Bovy arrived at 1005 West Mullan Avenue at approximately 6:20 p.m. on February 3, 2019. (*Id.*) When Officer Bovy first arrived at the residence, he walked to the back of the residence but did not see anyone. (Doc. 24 at 1.) Officer Payne arrived at the residence shortly after Officer Bovy. (*Id.*; Berryman Hr'g Test.) Officers Bovy and Payne then knocked on the back door of 1005 West Mullan Avenue to contact residents. (Doc. 24 at 1; Def. Ex. 2 at 5:45.)

After knocking on the back door, Officers Payne and Bovy first made contact with a girl who identified herself as a ten-year-old resident who lives at 1005 West Mullan Avenue with her "auntie" ("the aunt"). (Def. Ex. 2 at 5:50.) The girl later identified herself as Ms. Lathan's daughter, and stated that Ms. Latham left with her friends to get some food. (*Id.* at 7:45-8:00.) The aunt consented to Officers Bovy and Payne entering the apartment. (*Id.* at 6:18.) Officer Bovy asked if the aunt heard people yelling, but she denied having heard anything. (*Id.* at 6:30-6:46.)

**B.** **Officers Bovy and Payne's Contact with Ms. Latham and Defendant's Neighbor, Emmitt Johnson**

Officers Bovy and Payne next contacted Ms. Latham and Defendant's neighbor, Emmitt Johnson. The officers knocked on Mr. Johnson's door to initiate contact. (*Id.* at 10:22.) Mr. Johnson initially denied knowledge of an altercation, stating he had only recently arrived at his residence. (*Id.* at 10:40.) Mr. Johnson eventually acknowledged

he heard Defendant and Defendant's wife Sarabeth Miller arguing but stated no one else was outside and there was no physical altercation. (*Id.* at 10:40-11:35.)

## C.    *Law Enforcement Contact with Defendant, Ms. Miller, and Ms. Randall*

In addition to Defendant, Ms. Miller and Michele Randall also reside at 1005 1/2 West Mullan Avenue. (Gov. Ex. 1 at 4.) Officer Bovy knocked on Defendant's apartment door, and Defendant answered. (Bovy Hr'g Test.) Defendant spoke with the officers about a number of issues, including a prior incident involving the discovery of a pipe bomb at a different residence of Defendant and an altercation where Defendant asserted he had been beaten by the police. (*Id.*) Defendant, Ms. Miller, and Ms. Randall stated they all went to the back of the residence after hearing a loud noise because they were concerned someone was damaging their truck in the back parking lot. (Gov. Ex. 1 at 4.) Ms. Miller told Officer Bovy she was carrying a broken pool stick and Defendant was carrying a large knife when they checked the truck. (*Id.*) Defendant also stated he was carrying a large fixed blade knife when he checked the truck with Ms. Miller. (Doc. 23-2 at 1.) Ms. Miller claimed they walked past Ms. Latham behind the residence, where Ms. Latham was in an argument with an unidentified male. (Gov. Ex. 1 at 4.)

Officer Bovy requested Defendant consent to a search of the residence, but Defendant declined. (Bovy Hr'g Test.) Officer Bovy then spoke with Officer Thomas, who had been dispatched to 123 Elmwood Street, where Ms. Latham was located, at approximately 6:45 p.m. (Thomas Oct. 7, 2019 Hr'g Test.) While at 123 Elmwood Street, Officer Thomas spoke with Ms. Latham, Mr. Cole, Chelsea Cole, and Kayla Borntreger, who all reported seeing Defendant with a gun. (Gov. Ex. 1 at 4; Bovy Hr'g Test.) Ms. Borntreger and Ms. Cole stated Defendant was wearing a red shirt and had dreadlocks pulled into a ponytail. (Gov. Ex. 1 at 4.) Officers Thomas and Bovy called their sergeant supervisor, who advised them to obtain a search warrant. (Thomas Hr'g Test.)

6

After deciding to obtain a search warrant, law enforcement secured the residence to make sure no one was present other than those with whom law enforcement already made contact, Ms. Miller, Ms. Randall, and Defendant. (*Id.*) The officers decided that securing the residence required them to enter and conduct a protective sweep of the residence, only looking in areas large enough for people to hide. (Bovy Hr'g Test.)

Officers Berryman and Bovy testified they believed Defendant, Ms. Miller, and Ms. Randall could have left the residence if they desired but did not explicitly tell Defendant and the other residents they were free to leave. (*Id.*; Berryman Hr'g Test.) Officer Berryman testified he was not told Defendant and the residents were required to stay. (Berryman Hr'g Test.) Special Agent Saunders, who was not present when law enforcement secured the residence, reviewed video of officers securing the residence and could not recall officers instructing the residents that they were free to leave if they wanted. (Saunders, Oct. 7, 2019 Hr'g Test.) Defendant briefly left the residence to look at his truck. Officer Berryman accompanied him as a precautionary measure for officer safety. (Berryman Hr'g Test.) If Defendant, Ms. Miller, or Ms. Randall left the residence, law enforcement would not have allowed them back in. (Bovy Hr'g Test.) However, law enforcement did not tell Defendant, Ms. Miller, or Ms. Randall they were free to leave with the condition that they could not reenter the residence until a search was completed.

After informing Defendant, Ms. Miller, and Ms. Randall that law enforcement intended to obtain a search warrant for the residence, Ms. Miller told Officer Bovy she was willing to go to the police department and provide a statement.[1] (Bovy Hr'g Test.) Defendant and Ms. Randall were unwilling to provide statements. (*Id.*) Officer Bovy took Ms. Miller to the Waterloo Police Department so she could make a statement. (*Id.*) Officer Thomas returned to 123 Elmwood Street to bring Ms. Latham, Mr. Cole, Ms.

---

[1] Ms. Miller's statement was not offered into evidence.

Borntreger, and Ms. Cole to the Waterloo Police Department for interviews. (Doc. 23-1 at 1.) Each witness except Ms. Miller stated Defendant was holding a shotgun when he exited his residence. The witnesses provided somewhat differing accounts of whether Defendant pointed the shotgun at the witnesses, whether Defendant could see the witnesses, and where the witnesses were located when Defendant exited his apartment while holding the shotgun.

## D.    Police Interview with Ms. Latham

Officer Thomas interviewed Ms. Latham at the Waterloo Police Department on February 3, 2019. (Doc. 23-1 at 1; Def. Ex. 2, video of Ms. Latham.) During this interview, Ms. Latham described plans for Ms. Borntreger to give her a ride to the grocery store prior to the alleged incident. (Def. Ex. 2, video of Ms. Latham, at 1:05.) Ms. Latham stated that as she was leaving her apartment to get into Ms. Borntreger's car, Ms. Latham noticed a suitcase sitting on her porch, directly outside the back door that leads into her kitchen. (*Id.* at 1:18.) Ms. Latham believed this suitcase belonged to her upstairs neighbors, including Defendant. (*Id.* at 1:45.) Ms. Latham asked Mr. Cole to place the suitcase in Defendant's truck located behind the apartment building. (*Id.*) She then stated that Defendant exited his apartment while Ms. Borntreger was still sitting in her car and Mr. Cole and Ms. Latham had not yet reached Ms. Borntreger's car. (*Id.* at 2:30-2:53.) Ms. Latham claimed to have witnessed Defendant and an unidentified woman walking towards the pickup truck. (*Id.* at 3:10.) Ms. Latham stated that Defendant, carrying a shotgun, pointed it directly at her and Mr. Cole. (*Id.* at 3:45.) She stated she could hear Defendant say, "These motherfuckers," as he walked toward the pickup truck. (*Id.* at 3:10.) She stated this scared her, so she and Mr. Cole started to quickly walk back to her apartment. (*Id.* at 3:28.) Ms. Cole followed closely behind them from the direction of Ms. Borntreger's car, although the interview does not provide a clear picture of whether Ms. Cole was sitting inside Ms. Borntreger's car prior to

walking towards Ms. Latham's apartment or had walked with Mr. Cole and Ms. Latham from Ms. Latham's apartment towards Ms. Borntreger's car. (*Id.*) Ms. Latham stated that Defendant relaxed his shotgun's position, allowing the barrel to angle down towards the ground as she and Mr. Cole hurriedly walked back to her apartment. (*Id.* at 3:40.)

Ms. Latham described Defendant's shotgun as "brown" but stated Ms. Borntreger had a better angle to see the gun because she remained outside while the others hurried towards Ms. Latham's apartment. (*Id.* at 7:00-7:10.) Ms. Latham reiterated that Ms. Borntreger was in the car during the alleged incident, noting she could have driven away if Defendant started shooting. (*Id.* at 7:20.)

Ms. Latham later stated she had the door to Ms. Borntreger's car partially open when she heard Defendant come down the stairs from his apartment. (*Id.* at 7:38.) This differed from her prior statement that she was not by the vehicle when Defendant started to come down. (*Id.* at 3:20.)

Ms. Latham acknowledged she has a poor relationship with Defendant and dislikes him. (*Id.* 8:55.) She noted this was not her first encounter with Defendant, and she had previously called the police about her neighbors. (*Id.* at 8:15.) She had previously called the police to complain that Defendant purposefully moved the bathtub in his apartment and continuously ran the water, causing her daughter's bedroom ceiling to collapse. (*Id.* at 8:28.) She had also called the police to complain that Defendant yelled racial slurs at her children. (*Id.* at 8:44.)

### E.     *Police Interview with Mr. Cole*

Officer Thomas interviewed Mr. Cole at the Waterloo Police Department on February 3, 2019. (Doc. 23-1 at 1; Def. Ex. 2, video of Mr. Cole.) During this interview, Mr. Cole described Defendant descending the stairs from his apartment with a shotgun in hand. However, he did not clearly describe how Defendant held the shotgun or who was present with him during the alleged incident.

9

Mr. Cole stated he and Ms. Latham were leaving her apartment building when she noticed a bag that did not belong to her on her porch. (Def. Ex. 2, video of Mr. Cole, at 1:05.) Ms. Latham asked Mr. Cole to move the bag to her neighbor's pickup truck. (*Id.* at 1:35.) Mr. Cole did not state whether he actually placed the suitcase in the pickup truck. (*Id.*) He stated Defendant's apartment windows were open, which allowed Defendant to hear him talking with Ms. Latham. (*Id.* at 1:45.)

Mr. Cole stated "they" came downstairs, referring to Defendant and at least one other person, but he did not identify who accompanied Defendant. (*Id.* at 1:45.) Defendant was allegedly carrying a shotgun as he walked down the stairs from his residence, saying, "Motherfuckers, motherfuckers, motherfuckers." (*Id.*; *Id.* at 2:30, 3:00.) Mr. Cole described how Defendant held the shotgun, stating Defendant "had [the shotgun] like this," as he mimicked how Defendant held the shotgun. (*Id.* at 1:50.) Mr. Cole positioned his hands to demonstrate holding the shotgun in both hands across his body. The butt of the weapon is not raised to his shoulder. Mr. Cole demonstrated holding a shotgun in a position of readiness to fire, not as one might carry a shotgun to merely transport it or to avoid a discharge. (*Id.*) Mr. Cole stated Defendant "pointed" the shotgun but did not state whether Defendant pointed the shotgun at any individual. (*Id.* at 2:30.) Mr. Cole described the shotgun as having a black barrel and brown, "wood-like" stock. (*Id.* at 2:00-2:06.) He described Defendant as wearing a red shirt and having dreadlocks pulled back into a ponytail. (*Id.* at 2:10.)

Mr. Cole stated that after seeing Defendant descend the stairs with the shotgun, "we all hurried back in the house." (*Id.* at 2:45.) He did not state who is included in the term "we." (*Id.*) Mr. Cole stated he could hear Defendant walk back up to his apartment after Mr. Cole returned to Ms. Latham's apartment. (*Id.* at 3:55.)

Mr. Cole acknowledged an existing animosity between Ms. Latham and her friends and Defendant. (*Id.* at 3:20.) He stated that Defendant has called Ms. Latham

and her friends racial slurs in the past but stated this was the first time he saw Defendant carrying a gun. (*Id.*)

### F. Police Interview with Ms. Cole

Officer Thomas interviewed Ms. Cole at the Waterloo Police Department on February 3, 2019. (Doc. 23-1 at 1; Def. Ex. 2, video of Ms. Cole.) Ms. Cole described how she witnessed the alleged incident from inside Ms. Latham's porch.

Ms. Cole stated she and Ms. Latham were on Ms. Latham's porch, Ms. Borntreger was in her car, and Ms. Cole was walking from inside Ms. Latham's apartment towards the porch immediately before the alleged incident. (Def. Ex. 2, video of Ms. Cole, at 1:05; 2:20.) Ms. Cole stated Defendant held a gun as he stood outside with two women, repeatedly saying, "Motherfuckers." (*Id.* at 1:15; 2:10.) Ms. Cole did not elaborate on the term "outside," so it is unclear whether this means outside on the porch, outside by the pickup truck, or in another location outside of the apartment building. She observed Defendant and the two women from Ms. Latham's porch, as she could look through the porch's glass door. (*Id.* at 2:00.)

Ms. Cole described the gun Defendant held as a brown shotgun. (*Id.* at 1:35; 3:15.) She stated she was unsure whether Defendant pointed the gun at anyone. (*Id.* at 2:25.) After seeing Defendant outside with a gun, Ms. Cole stated that she and Ms. Latham returned to Ms. Latham's apartment, and Defendant walked up the stairs back to his apartment. (*Id.* at 2:40.)

Ms. Cole described Defendant as wearing a red shirt and black or blue sweatpants. (*Id.* at 1:40.) She further described Defendant as having his hair pulled back in a ponytail. (*Id.*)

Officer Bovy's affidavit in support of the search warrant incorrectly states, "I spoke with" Ms. Cole. (Gov. Ex. 1 at 4.) Officer Thomas actually spoke with her. (*Id.*; Bovy Hr'g Test.) The officers' testimony was contradictory regarding how this

misstatement occurred. Officer Bovy stated that he and Officer Thomas each typed a portion of the document. Officer Bovy stated that Officer Thomas typed "I spoke with" Ms. Cole, but Officer Bovy signed the document so it should have stated, "Officer Thomas spoke with" Ms. Cole. (Bovy Hr'g Test.) Officer Thomas stated Officer Bovy typed while he dictated. (Thomas Hr'g Test.)

## G.   *Police Interview with Ms. Borntreger*

Officer Thomas interviewed Ms. Borntreger at the Waterloo Police Department on February 3, 2019 (Doc. 23-1 at 1; Def. Ex. 2, video of Ms. Borntreger.) Ms. Borntreger's statements did not align with aspects of the other witnesses' statements, especially regarding where witnesses were located during the incident.

Ms. Borntreger stated Ms. Latham called her for a ride to the grocery store. (Def. Ex. 2, video of Ms. Borntreger, at 1:05.) She then drove to Ms. Latham's apartment and parked behind the apartment. (*Id.* at 1:15.) She entered Ms. Latham's apartment and waited for Ms. Latham to finish getting ready. (*Id.* at 1:20.) Ms. Borntreger stated Ms. Latham saw Defendant's suitcase on the porch as she, Ms. Latham, Mr. Cole, and Ms. Cole walked out of Ms. Latham's apartment.[2] (*Id.* at 1:20; 4:45.) Ms. Latham and Mr. Cole then put the suitcase into the truck parked behind the apartment. (*Id.* at 1:35.) Ms. Latham and Mr. Cole then returned to Ms. Latham's apartment. (*Id.*)

Shortly after Ms. Latham and Mr. Cole returned to the house, Ms. Borntreger heard Defendant and two women come down the stairs outside of the apartment. (*Id.* at 1:42.) Ms. Borntreger stated that she, Ms. Latham, Mr. Cole, and Ms. Cole stayed in the front porch to watch Defendant and the two women. (*Id.* at 1:55.) She said that Defendant was carrying a gun while mumbling, "Fuck motherfuckers," and walking

---

[2]Ms. Borntreger first stated Ms. Latham saw the suitcase as "we" left Ms. Latham's apartment, making it difficult to determine who "we" referred to in this context. Later, at 4:45 in the video, Ms. Borntreger clarified that "we" meant her, Ms. Latham, Mr. Cole, and Ms. Cole.

12

behind the apartment building. (*Id.* at 2:05; 3:00.) Ms. Borntreger told Officer Thomas that as Defendant walked around the apartment building, she, Ms. Latham, Mr. Cole, and Ms. Cole decided to exit the apartment building through Ms. Latham's back door and go to Ms. Borntreger's residence to call the police. (*Id.* at 2:15.)

Ms. Borntreger described the gun Defendant was holding as "a regular shotgun" with a wood-grain grip and stock and a black barrel. (*Id.* at 2:35-2:50.) She stated Defendant did not point the shotgun at anyone because Defendant could not see her or the other witnesses, as they all watched Defendant from inside Ms. Latham's porch. (*Id.* at 4:27-5:00.) Ms. Borntreger instead described Defendant as carrying the shotgun in a manner that would allow him to shoot quickly if necessary. (*Id.*)

Ms. Borntreger described one of the women with Defendant as approximately the same age as Defendant, with dark hair, while the other woman appeared to be several years older than Defendant. (*Id.* at 3:15.) The woman who was approximately the same age as Defendant wore a gray and white striped coat, while the older woman wore a gray or black T-shirt and jeans. (*Id.* at 3:40.)

Ms. Borntreger described Defendant as wearing a red T-shirt with the sleeves cut off and pants that were either camouflage or had another pattern. (*Id.* at 3:50.) She stated Defendant had dark hair in dreadlocks pulled into a ponytail. (*Id.* at 4:00.)

Officer Bovy's affidavit in support of the search warrant contains the same misstatement regarding Ms. Borntreger's interview as the misstatement regarding Ms. Cole's interview. Officer Bovy wrote "I spoke with" Ms. Borntreger, but Officer Thomas actually spoke with her. (Gov. Ex. 1 at 4; Bovy Hr'g Test.) The explanations for the discrepancy are the same as above. (Bovy Hr'g Test.; Thomas Hr'g Test.)

**H.** ***Search of 1005 1/2 West Mullan Avenue and Subsequent Arrest of Defendant***

After Ms. Miller provided a statement at the Waterloo Police Department, Officer Bovy drove her back to the residence. (Bovy Hr'g Test.; Gov. Ex. 1 at 1.) Officer Bovy

13

then finalized the affidavit and presented it to a judge who issued a search warrant for 1005 1/2 W. Mullan Avenue at approximately 9:36 p.m. (*Id.*) At the time Officer Bovy applied for the search warrant, he believed law enforcement was investigating a possible assault involving a shotgun.[3] (Bovy Hr'g Test.) Officer Bovy thus sought the search warrant to find the firearm allegedly used in the assault. (*Id.*) Officer Bovy returned to the Waterloo Police Department to make a copy of the signed warrant, and then returned to the residence to execute the warrant. (*Id.*) The application describes Defendant "walking with a shotgun in his hands and cursing," as well as having "pointed the gun" at two people. (Gov. Ex. 1 at 4.)

Officer Bovy read the warrant to Defendant, Ms. Miller, and Ms. Randall when he returned to the residence, and the officers began the search. (*Id.*) Officer Thomas found a pump action shotgun with a black barrel and brown wood stock and foregrip propped against the door frame inside the kitchen. (Doc. 23-1 at 1; Gov. Ex. 3 at 12.) A T-shirt was covering part of the barrel, and the butt of the gun was in a pan filled with cat food. (Doc. 23-1 at 1; Gov. Ex. 3 at 12.)

Following the search, Defendant was placed under arrest. (Bovy Hr'g Test.; Doc. 24 at 2.) Upon arrest, Officer Bovy searched Defendant and found a red plastic straw with white powder residue and two plastic bags containing suspected methamphetamine. (Doc. 21-1 at 1; Doc. 24 at 2.) Defendant was indicted with two federal criminal counts, Possession of a Firearm by a Felon and Possession of a National Firearms Act Short-Barreled Shotgun Not Registered to Possessor. (Doc. 2 at 1.)

---

[3] Iowa Code § 708.1(2)(C) 2019 (defining "intentionally point[ing] any firearm toward another, or display[ing] in a threatening manner any dangerous weapon toward another" as assault).

*I.* ***Conclusions from the Bureau of Alcohol, Tobacco, Firearms and Explosives Regarding the Shotgun Seized at 1005 1/2 West Mullan Avenue***

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") concluded the shotgun found in Defendant's residence is properly classified as a short-barreled shotgun as defined in 18 U.S.C. Section 921(a)(6). (Gov. Ex. 9 at 3.) Cody J. Toy, a Firearms Enforcement Officer with ATF, examined and tested the shotgun before sending a report to Special Agent Joseph Saunders classifying the firearm as a short-barreled shotgun. (Gov. Ex. 9.) Officer Toy measured the barrel length by placing the shotgun on a flat surface, closing the bolt, and inserting a cylindrical scale into the barrel's muzzle until the scale touched the bolt face. (*Id.* at 2.) Officer Toy measured the barrel and found it to be 17-7/8 inches long. (*Id.* at 2-3.) Photos show the barrel is not of uniform length, and it appears to be cut. (*Id.* at 12-14.) Although not uniform in length, the entire barrel also appears to be less than eighteen inches long. (*Id.* at 14.)

Special Agent Joseph Saunders is a police officer with the Waterloo Police Department and a task force officer with ATF. (Saunders Oct. 7, 2019 Hr'g Test.) He was not directly involved in the search of Defendant's residence, but was the recipient of ATF's report on the seized shotgun. (Gov. Ex. 9 at 1.)

## III. ANALYSIS

A. ***Defendant was not entitled to a* Franks *hearing.***

At the October hearing, I stated that I had doubts whether Defendant had demonstrated a sufficient showing that he was entitled to a hearing pursuant to *Franks v. Delaware*. Over the Government's objection, I decided that, in the interest of judicial economy, I would take up all the evidence at the October hearing, hold a *Franks* hearing, and then determine whether Defendant was entitled to the *Franks* hearing. Defendant incorrectly interpreted this to mean the Court found Defendant satisfied the burden to show he was entitled to a *Franks* hearing. (Doc. 55 at 8.)

Defendant offers three arguments in support of his request for a *Franks* hearing. First, Defendant argues that two paragraphs of the addendum to Officer Bovy's application for a search warrant are materially false or misleading when read together. (Doc. 11-2 at 3-5.) Second, Defendant argues he is entitled to a *Franks* hearing because Officer Bovy's application for a search warrant did not describe Officer Bovy's interactions with Defendant's neighbors prior to Officer Bovy's contact with Defendant. (*Id.* at 8.) Third, Defendant argues "officers failed to note in the application . . . that [Ms.] Latham's account was inconsistent with the physical layout of" 1005 West Mullan Avenue. (Doc. 55 at 13.) These arguments do not provide a substantial preliminary showing that Officer Bovy intended to mislead the issuing judge or acted with reckless disregard to whether the application would mislead the issuing judge.

The Government argues that Officer Bovy's application in support of the search warrant did not contain a materially misleading statement or omission. (Doc. 32-1 at 4.) The Government relies on *United States v. Neal* in arguing that false information and omissions in an affidavit do not necessarily mean the affiant included or omitted the information intentionally, deliberately, or with reckless disregard for the truth. *United States v. Neal*, 528 F.3d 1069, 1073 (8th Cir. 2008); (Doc. 32-1 at 5.) In *Neal*, the affiant included false information in an affidavit that stated law enforcement had an arrest warrant for the defendant. *Neal*, 528 F.3d at 1073 (8th Cir. 2008). The affiant, however, was unaware that law enforcement did not have an arrest warrant for the defendant. *Id.* The Eighth Circuit upheld the affidavit because "there [was] no evidence that the officers involved . . . acted intentionally, deliberately, or with reckless disregard for the truth when they caused the false statement to be included in the affidavit."

The Government further argues that Defendant cannot meet his burden to show that probable cause would not have existed if the omitted information was included in the affidavit. (Doc. 32-1 at 6.) The Government cites *Illinois v. Gates* that held whether

16

probable cause exists is based on "the totality of the circumstances" and exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. 213, 238 (1983); (Doc. 32-1 at 6-7) (citation omitted). The Government argues that even if the omitted information had been included in the affidavit, it would still have been possible for the issuing judge to find probable cause to search Defendant's residence.

1.    **Standard of Review for Determining Whether Defendant is Entitled to a Franks Hearing**

*Franks* held that a defendant is entitled to a hearing when he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. The Eighth Circuit has extended *Franks* to allow defendants to challenge affidavits by asserting the affiant deliberately or recklessly omitted information. *United States v. Reivich*, 793 F.2d 957, 960-61 (8th Cir. 1986). "[T]he failure to include the information and a reckless disregard for its consequences may be inferred from the fact that the information was omitted. . . . [F]or this inference to be valid, the defendant must show the omitted material would be '"clearly critical" to the finding of probable cause.'" *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (quoting *Reivich*, 793 F.2d at 961). Given that law enforcement sought a warrant because of a suspected assault using a shotgun (Bovy Hr'g Test.), the questions before the Court are whether Defendant made a substantial preliminary showing that the false information Officer Bovy included in the warrant application was necessary and whether omissions from the warrant application were clearly critical to the issuing judge's finding probable cause. *See Franks*, 438 U.S. at 155-56; *Jacobs*, 986 F.2d at 1235; *Reivich* 793 F.2d at 960-61.

17

## 2. Officer Bovy did not intend to mislead the issuing judge or act with reckless disregard for the truth when he mistakenly stated in the application that he spoke with Ms. Borntreger and Ms. Cole.

Defendant's only allegation of false or misleading information in the application concerns two paragraphs that Defendant alleges, "when read together, are materially false or misleading." (Doc. 11-2 at 3.) The two paragraphs at issue are paragraphs six and seven on page four of Government Exhibit 1:

> Officer Thomas with the Waterloo Police Department spoke with Takeela Latham who advised while at her home at 1005 W. Mulan, she walked out of her residence and noticed a suitcase on her deck. Latham advised she did not put the item there and knew her upstairs neighbor Levi Miller has placed items on the deck before with her permission. Latham advised her friend Jarrell Cole to take the suitcase and place it in Levi Miller's truck that was located in the parking area of the apartment. Latham then advised she heard someone coming down the stairs from the upstairs apartment. Latham advised she turned to see Defendant walking with a shotgun in his hands and cursing. Latham advised Defendant pointed the gun at her and Jarrell Cole. Latham described the gun as having a black barrel and wood along the stock. Latham advised herself and Jarrell Cole ran back into their apartment.

> I spoke with witnesses Kayla Borntreger and Chelsea Cole who were also on scene as the incident unfolded. Chelsea Cole and Kayla Borntreger advised the gun was black in color and had wood coloring around the stock. Kayla Borntreger and Chelsea Cole advised Defendant as wearing a red shirt and having dreads in his hair pulled back into a pony tail.

(Gov. Ex. 1 at 4.)

Defendant's assertion that the affidavit in support of the search warrant contains the above two paragraphs that "when read together, are materially false or misleading" (Doc. 11-2 at 3) does not state a colorable claim of a violation of Defendant's rights under *Franks v. Delaware*. Officer Bovy's assertion in the affidavit that he, rather than Officer Thomas, spoke with Ms. Borntreger and Ms. Cole is the only false affirmative statement Defendant argues constitutes a *Franks* violation. (*Id.* at 3-4.) In *Franks*, the United

States Supreme Court held that, under certain circumstances, a defendant is entitled to a hearing to "challenge the veracity of a sworn statement" police used to obtain a search warrant:

> In the present case the Supreme Court of Delaware held, as a matter of first impression for it, that a defendant under no circumstances may so challenge the veracity of a sworn statement used by police to procure a search warrant. We reverse, and we hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. 154, 155-56 (1978). Showing a false statement in an affidavit was inserted deliberately or with reckless disregard for the truth "is 'not met lightly.'" *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004) (quoting *United States v. Wajda*, 810 F.2d 754, 769 (8th Cir. 1987)). A defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false; and [the allegations] should be accompanied by a statement of supporting reasons." *Id.* (quoting *Franks*, 438 U.S. at 171) (alterations in original).

Defendant's claim of a *Franks* violation based on affirmative false statements rests on the argument that Officer Bovy signed the addendum to the application, but Officer Thomas is the officer who spoke with Ms. Borntreger and Ms. Cole. (Doc. 11-2 at 3-4.) Officer Bovy acknowledged this during the October 7 hearing. (Bovy Hr'g Test.) While Officer Bovy's signed statement that "I spoke with witness Kayla Borntreger and Chelsea Cole" (Gov. Ex. 1 at 4) is false, Defendant acknowledges this falsehood "probably would not have made much difference to the judge to know that it was Officer Thomas who spoke with" Ms. Borntreger and Ms. Cole. (Doc. 11-2 at 4.) Defendant thus acknowledges the false statement does not satisfy the second requirement for a *Franks* violation, that the "false statement [be] necessary to the finding of probable

cause." *Franks*, 438 U.S. at 155-56. As such, the false statement in the application does not give rise to a *Franks* violation.

> **3.** **Officer Bovy's omissions do not constitute a substantial preliminary showing that Officer Bovy intended to mislead the issuing judge or acted with reckless disregard as to whether the application would mislead the issuing judge.**

Defendant also argues certain omissions entitle him to a *Franks* hearing. (Doc. 11-2 at 4-8; Doc. 55 at 10-14.) Although Officer Bovy omitted information from the application, Defendant does not offer evidence that Officer Bovy omitted information to intentionally mislead the issuing judge, therefore, the question before the Court is whether Officer Bovy's omissions constitute a reckless disregard for the truth. "[F]or omissions of fact, [Defendant] must show: '(1) that facts were omitted . . . in reckless disregard of whether they make[] the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.'" *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (quoting *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015)). An affiant has omitted a fact with reckless disregard if "the officer 'must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information.'" *Id.* For the reasons discussed below, I find Officer Bovy did not omit information with reckless disregard for the truth.

Defendant first argues that Officer Bovy recklessly omitted Ms. Borntreger's statement that contradicted Ms. Latham's claim that Defendant pointed a gun at someone. (Doc. 11-2 at 4.) The record does not show Officer Bovy must have entertained serious doubts as to the truthfulness of the affidavit or had obvious reasons to doubt the accuracy of the information he reported. *See Reed*, 921 F.3d at 756. Officer Bovy was presented with statements from multiple witnesses stating Defendant was angry and cursing while carrying a shotgun. Ms. Latham stated Defendant pointed the shotgun at her. (Def. Ex.

2, video of Ms. Latham, at 3:45.)  Mr. Cole stated Defendant "pointed" the shotgun but did not state whether the shotgun was pointed at any individual.  (Def. Ex. 2, video of Mr. Cole, at 2:34.)  Ms. Cole stated Defendant had a gun, but she was unsure whether Defendant pointed the gun at anyone.  (Def. Ex. 2, video of Ms. Cole, at 2:27.)  Ms. Borntreger was the only eyewitness to directly state Defendant did not point the gun at anyone.  (Def. Ex. 2, video of Ms. Borntreger, at 5:10.)

These eyewitness statements did not provide Officer Bovy with obvious reasons to doubt the accuracy of Ms. Latham's statement that Defendant pointed a gun at her and Mr. Cole, nor did the statements give Officer Bovy serious doubts as to the validity of Ms. Latham's statement.  Moreover, I do not conclude that Officer Bovy acted with reckless disregard for the truth when he omitted Ms. Borntreger's statement that contradicted Ms. Latham's claim that Defendant pointed a shotgun at Ms. Latham and Mr. Cole.  As stated above, Iowa Code Section 708.1(2)(c) criminalizes not only pointing a firearm toward another person, but also displaying it in a threatening manner.  Ms. Borntreger may not have seen Defendant "point" the shotgun, but what she saw was at least consistent with displaying a firearm in a threatening manner.

Defendant next argues that Officer Bovy acted with reckless disregard for the truth when he omitted Officer Bovy's encounters with the girl, the aunt, and Mr. Johnson. (Doc. 11-2 at 8.)  However, nothing in the record indicates Officer Bovy must have entertained serious doubts about the truthfulness of his statements or had any obvious reasons to doubt the accuracy of the information he wrote in the affidavit.  *See Reed*, 921 F.3d at 756.  As described above, Officer Bovy's first interaction after he arrived at 1005 West Mullan Avenue was with a young girl and the aunt, after which Officer Bovy spoke with Mr. Johnson.  Officer Bovy asked the aunt if she heard people yelling, but she denied having heard anything.  (Def. Ex. 2, video of Officer Bovy, at 6:30-6:46.)  Mr. Johnson initially denied knowledge of an altercation, but eventually stated he heard

Defendant and Ms. Miller arguing. (*Id.* at 10:22-11:35.) Mr. Johnson stated he neither saw a physical altercation nor saw anyone other than Defendant and Ms. Miller outside. (*Id.*)

Although the aunt denied having heard people yelling and Mr. Johnson was hesitant to acknowledge he was aware of a verbal altercation near his residence, these events were not obvious reasons for Officer Bovy to doubt the accuracy of the information he put in his application. Officer Bovy testified that, in his experience, he sometimes has difficulty persuading witnesses to provide him information. (Bovy Hr'g Test.) He further testified it is more difficult to talk to people when firearms are involved in the alleged incident. (*Id.*) In this situation, with Defendant's alleged pointing or displaying of a shotgun, neighbors' hesitance to provide Officer Bovy with information was not an obvious reason for Officer Bovy to doubt the accuracy of the information he put in his application. Furthermore, it does not follow from the aunt's and Mr. Johnson's denials that Officer Bovy must have entertained serious doubts about the truthfulness of the statements he put into the application. Rather than create serious doubts about the truthfulness of Officer Bovy's application, Mr. Johnson's and the aunt's hesitancy may have been due to their desire to avoid any confrontation with Defendant or law enforcement. As such, I find Officer Bovy did not act with reckless disregard for the truth when he omitted from the application his encounters with a young girl, the aunt, and Mr. Johnson.

Defendant lastly argues that Officer Bovy acted with reckless disregard for the truth when he "failed to note in the application . . . that [Ms. Latham's] account was inconsistent with the physical layout of the location." (Doc. 55 at 13.) Defendant argues 1005 West Mullan's physical layout refutes Ms. Latham's account that Defendant pointed a shotgun at Mr. Cole and her because "the evidence at the suppression hearing establishes that there is no direct path from the stairs to [Defendant's] apartment to the

22

back of the residence." (*Id.* at 14.) However, Ms. Latham's account of the incident does not require that a direct path exist between the stairs to Defendant's apartment and the back of the residence. As such, Officer Bovy would not have necessarily entertained serious doubts about the truthfulness of his statements nor would he have any obvious reason to doubt the accuracy of the information he wrote in the affidavit. *See Reed*, 921 F.3d at 756.

During her meeting with Officer Thomas, Ms. Latham stated she was with Mr. Cole near the pickup truck behind the residence. She said Mr. Cole was placing a suitcase in the pickup truck. She stated she saw Defendant holding a shotgun as Defendant, Ms. Miller, and Ms. Randall walked toward the truck. (Def. Ex. 2, video of Ms. Latham, at 3:02.) Ms. Latham also stated Defendant pointed the shotgun at Mr. Cole and her "when he came down." (*Id.* at 3:45.) The phrase "when he came down" does not necessarily mean Defendant pointed the gun at Ms. Latham and Mr. Cole while Defendant was walking down the stairs. Instead, Officer Thomas could reasonably have interpreted this statement to mean Ms. Latham was claiming Defendant pointed the shotgun at Mr. Cole and her after Defendant had descended the stairs.

Photos of 1005 West Mullan Avenue show that a direct path between the stairs leading to Defendant's apartment and the back of the residence is not necessary for Ms. Latham to have seen him holding a shotgun while he, Ms. Randall, and Ms. Miller walked toward Ms. Latham and Mr. Cole. (Gov. Ex. 3 at 1-4.) The alleged discrepancy between Ms. Latham's statements and the physical layout of 1005 West Mullan may not exist. The mere possibility of a discrepancy, without more, would not have caused Officer Bovy to entertain serious doubts about the truthfulness of the statements in the application. This also was not an obvious reason for Officer Bovy to doubt the accuracy of the information he put in his application. As such, I find Officer Bovy did not act with reckless disregard for the truth when he omitted from his application the alleged

discrepancy between Ms. Latham's statements and 1005 West Mullan's layout. *See Reed*, 921 F.3d at 756.

### 4. The alleged false statement was not necessary to the issuing judge's finding of probable cause, and the omitted information was not clearly critical to the issuing judge's finding of probable cause.

Even if the District Court rejects my recommendation and finds that Officer Bovy intended to mislead the issuing judge or acted with reckless disregard for the truth, Defendant was not entitled to a *Franks* hearing. The false information was not necessary to the issuing judge's finding of probable cause, nor was the omitted information clearly critical to the issuing judge's finding of probable cause. As described above, even if the Court infers Officer Bovy acted with reckless disregard for the truth because he omitted information, this inference is valid only if the omitted material was "'clearly critical' to the finding of probable cause." *United States v. Jacobs*, 986 F.2d 1231, 1234-35 (8th Cir. 1993) (quoting *Reivich*, 793 F.2d at 961.) Information or an omission is clearly critical to the finding of probable cause if, absent such information or omission, there would not be a fair probability that contraband or evidence of a crime would be found in the place to be searched. *United States v. Smith*, 581 F.3d 692, 695 (8th Cir. 2009) (finding that "omission of the fact that [the defendant's] trash included mail addressed to other persons at 4401 5th Avenue South, and that trash from two garbage cans might have been pulled, raising the possibility that the drug residue and paraphernalia came from the other unit's trash, did not eliminate the affidavit's showing of a fair probability that evidence of narcotics trafficking could be found in [the defendant's home]"); *See also Gates*, 462 U.S. at 238 (holding that probable cause exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place").

Thus, the first question before the Court is whether Officer Bovy's false statement that "I spoke with witnesses Kayla Borntreger and Chelsea Cole" was necessary for the issuing judge to find probable cause. *See Franks*, 438 U.S. at 155-56 (requiring the false

statement in an affidavit be "necessary to the finding of probable cause" for a defendant to be entitled to a *Franks* hearing). The second question before the Court is whether the omissions discussed above were "clearly critical" for the issuing judge to find probable cause. *See Jacobs*, 986 F.2d at 1234-35 (requiring an omission in an affidavit be "clearly critical" to the issuing judge's finding of probable cause for a defendant to be entitled to a *Franks* hearing).

I find Officer Bovy's false statement in the application claiming he spoke with Ms. Borntreger and Ms. Cole was not necessary for the issuing judge to find probable cause for a search warrant. If Officer Bovy had instead stated, "Officer Thomas spoke with witnesses Kayla Borntreger and Chelsea Cole," the issuing judge's weighing of the facts would not have changed. This false statement did not alter the content of Ms. Borntreger or Ms. Cole's statements. Defendant offered no reason to believe one officer was more credible than the other or that the issuing judge would have knowledge of any difference in their relative credibility. Furthermore, both Officers Thomas and Bovy were involved in responding to and investigating the reported incident, so changing "I" to "Officer Thomas" would most likely not have altered the judge's conclusion. Defendant appears to concede that it "probably would not have made much difference to the judge to know that it was Officer Thomas who spoke with them." (Doc. 11-2 at 4.)

I also find Officer Bovy's omission of Ms. Borntreger's statement that Defendant did not point the gun at the eyewitnesses and could not see the eyewitnesses was not clearly critical to the issuing judge's finding of probable cause. Even if Officer Bovy had included her statement, the issuing judge would still have had testimony from multiple eyewitnesses that Defendant was angry and cursing while carrying a shotgun. (Def. Ex. 2, video of Ms. Borntreger, at 2:05; 3:00; Def. Ex. 2, video of Ms. Cole, at 1:15; 2:10; Def. Ex. 2, video of Mr. Cole, at 1:45; 2:30; 3:00; Def. Ex. 2, video of Ms. Latham, at 3:10; 3:45.) Even if Ms. Borntreger did not see Defendant point the shotgun, Officer

Thomas could reasonably conclude her statement supported the assertion that Defendant carried the shotgun in a threatening manner. All of the eyewitnesses except Ms. Borntreger stated they saw Defendant walk back toward his apartment with the shotgun. (Def. Ex. 2, video of Ms. Cole, at 2:40; Def. Ex. 2, video of Mr. Cole, at 3:55; Def. Ex. 2, video of Ms. Latham, at 3:40.) Additionally, the issuing judge would have had Ms. Latham's statement that defendant pointed the shotgun at her. (Def. Ex. 2, video of Ms. Latham, at 3:45.) Thus, had Officer Bovy included Ms. Borntreger's statement that Defendant did not see the eyewitnesses and did not point the shotgun at them, the eyewitness statements would still have created a fair probability that evidence of a crime (i.e., a shotgun as evidence of an assault) would be found in Defendant's residence. *See Gates*, 462 U.S. at 238.

I also find Officer Bovy's omissions of his contact with the girl, the aunt, and Mr. Johnson were not clearly critical to the issuing judge's finding of probable cause. Even if Officer Bovy had included the aunt's statement that she did not hear anything (Def. Ex. 2, video of Officer Bovy, at 6:30-6:46), the alleged incident did not require any loud noises. When Officer Bovy decided to apply for the search warrant, he believed he was investigating an assault with a shotgun. (Bovy Hr'g Test.) As described above, "display[ing] in a threatening manner any dangerous weapon toward another" constitutes an assault under Iowa law. *See* Iowa Code § 708.1(2)(c) (2019). Displaying a firearm in a threatening manner towards another person does not require any sound at all. Thus, the aunt's statement that she did not hear anything, if included, would likely not have changed the issuing judge's finding of probable cause and was thus not clearly critical to the issuing judge's finding of probable cause.

I also find Officer Bovy's omission of his contact with Mr. Johnson was not clearly critical to the issuing judge's finding of probable cause because assault can be a silent crime. As described above, Mr. Johnson initially denied knowledge of an altercation.

26

He eventually stated he heard Defendant and Ms. Miller arguing, but he neither saw a physical altercation nor saw anyone other than Ms. Miller and Defendant outside. (Def. Ex. 2, video of Officer Bovy, at 10:22-11:35.) Mr. Johnson's statements are not inconsistent with Ms. Latham's report of Defendant committing an alleged assault. Therefore, Mr. Johnson's statement that he only heard a verbal altercation between Defendant and Ms. Miller, if included, would likely not have changed the issuing judge's finding of probable cause and was thus not clearly critical to the issuing judge's finding of probable cause.

Lastly, I also do not find Officer Bovy's omission of the alleged discrepancy between Ms. Latham's statements and the physical layout of the residence was clearly critical to the issuing judge's finding of probable cause. As described above, the discrepancy Defendant alleges may not be a discrepancy at all and is not supported by evidence in the record. Thus, if Officer Bovy had included the discrepancy between Ms. Latham's statements and the physical description of the residence as Defendant alleges, this information would not have necessarily changed the issuing judge's finding of probable cause.

### 5. Conclusion

For all of the above reasons, I find that Defendant failed to satisfy his burden to show he was entitled to a *Franks* hearing.

### B. The Court should not suppress evidence seized inside Defendant's residence.

Defendant offers three arguments in support of his motion to suppress. (Doc. 12-1 at 1-3.) First, Defendant argues the police entered the residence without a warrant and detained Defendant, Ms. Randall, and Ms. Miller for several hours. (*Id.* at 1.) Second, Defendant argues the Court should suppress the shotgun because it was not in plain view and was not described in law enforcement's search warrant. (*Id.* at 4-5.) Third, Defendant argues the address on law enforcement's search warrant is nonexistent and the

physical description of Defendant's residence does not match Defendant's residence. (*Id.* at 4-6.)

The Government responds that the exigent circumstances exception to the Fourth Amendment's warrant requirement justifies the warrantless entry into Defendant's residence. (Doc. 33-1 at 3.) The Government also argues police properly seized the shotgun because it fits the description of the firearm provided in the search warrant. (*Id.* at 6.) The Government further argues the plain view doctrine authorizes law enforcement's seizure of the shotgun because Defendant's felony status means any firearm in Defendant's residence is evidence of an incriminating character. (*Id.*) Lastly, the Government argues the search warrant properly described Defendant's residence and argues in the alternative that suppression is an inappropriate remedy because the search warrant described the residence with enough particularity for law enforcement to identify the residence. (*Id.* at 5-6.)

### 1. *Exigent circumstances justified entry into Defendant's residence.*

Law enforcement's warrantless entry into Defendant's residence was allowable because exigent circumstances created a concern for officer safety. "Exigent circumstances may provide a basis for a warrantless entry. . . . It is not necessary to obtain a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Clement*, 854 F.2d 1116, 1119 (8th Cir. 1988.) (citations omitted). "Exigent circumstances exist where law enforcement officers have a 'legitimate concern for the safety of themselves or others.'" *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003) (quoting *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995)). The Court determines whether a situation presents exigent circumstances using an objective standard that "focus[es] on what a reasonable, experienced police officer would believe." *Id.* (internal quotations and citation omitted).

### a.    Officer Safety

"A legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm." *United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006) (citing *United States v. Hill*, 430 F.3d 939, 941 (8th Cir. 2005)). "The analysis of whether this exception to the warrant requirement has been made out is an objective one focusing on what a reasonable, experienced police officer would believe." *Kuenstler*, 325 F.3d at 1021 (quotation omitted). Officers may be justified in entering a residence "when law enforcement officials have a 'legitimate concern for the safety' of themselves or others." *United States v. Vance*, 53 F.3d 220, 222 (8th Cir. 1995) (quoting *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989)).

For example, in *United States v. Williams*, law enforcement engaged an informant to sell the defendant fake cocaine. 633 F.2d 742, 743 (8th Cir. 1980). Worried about their informant's safety once the cocaine was tested and found to be fake, law enforcement entered Williams's home and arrested him without a warrant. *Id*. *Williams* found there was reasonable fear of harm to the informant, and thus, exigent circumstances justified the entry and warrantless arrest. *Id*. at 744.

In the case at bar, circumstances existed that would give a reasonable, experienced police officer legitimate concern for his or her safety. Law enforcement was dispatched to 1005 West Mullan Avenue in response to a report that Defendant was displaying a shotgun in a threatening manner. (Doc. 23-2 at 1.) Entering an environment where police believed an individual may be displaying a firearm in a threatening manner would make a reasonable, experienced police officer concerned for his or her safety. Securing the residence from the outside could have proved dangerous because of Defendant's reported possession of a weapon that could have been used offensively from the interior of the residence or against people inside the residence. Officer Bovy's testimony and

29

Defendant's Exhibit 7 shows law enforcement on the scene were aware of the prior incident where officers found a bomb at Defendant's residence. (Doc. 56 at 6.) As such, an exigent circumstance existed that justified law enforcement's warrantless entry into Defendant's residence.

### b.    Destruction of Evidence

"[T]he exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 469 (2011). "The risk that evidence will be destroyed during the time required to obtain a search warrant can be an exigent circumstance that justifies a warrantless entry." *United States v. Leveringston*, 397 F.3d 1112 1116 (8th Cir. 2005) (citations omitted). "When the exigency at issue is destruction of evidence, police officers must demonstrate a sufficient basis for an officer to believe that somebody in the residence . . . will imminently destroy evidence." *United States v. Ramirez*, 676 F.3d 755, 760 (8th Cir. 2012) (citation omitted). The inquiry is objective and asks, "whether a reasonable, experienced police officer would believe evidence was in danger of removal or destruction." *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (citation omitted). *Cisneros-Gutierrez* held:

> After arriving at the house and announcing themselves, the officers witnessed evasive behavior. Gerardo and Alfonso consulted one another, following which Gerardo's feigned confusion appeared to be a delaying tactic during which Alfonso took several plastic bags to the kitchen sink and disposed of their contents. Taken together these circumstances justified the officers' warrantless entry.

*Id.*

In the instant case, officers had reason to be concerned Defendant would destroy or, more likely, dismantle, and hide the shotgun. After Defendant initially denied officers entry, the officers informed Defendant they were seeking a search warrant for his residence. (Doc. 23-1 at 1.) Defense counsel correctly pointed out a shotgun is

qualitatively different from drugs because a person facing an imminent search warrant cannot quickly dispose of a shotgun by flushing it down a toilet. (Bovy Hr'g Test.) However, a person can dismantle or break down a shotgun and hide the parts. Officers knew Defendant was aware of their intention to obtain a search warrant, and it was thus reasonable for the officers to conclude Defendant had the opportunity and incentive to destroy, dismantle, or secrete the weapon if he was left in possession of it in the residence.

### c. The inevitable discovery doctrine is applicable because law enforcement did not exploit their presence in the residence.

Even if the Court decides law enforcement's entry into Defendant's residence was unlawful, the inevitable discovery doctrine is applicable and should prevent the Court from suppressing the shotgun. "Where information is discovered after police violate the Fourth Amendment, the evidence should not be suppressed '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Sallis*, 920 F.3d 577, 582-83 (8th Cir. 2019) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). *Sallis* presented the Eighth Circuit with facts similar to this case. In *Sallis*, law enforcement executed a warrantless entry into the apartment where the defendant was staying and conducted a protective sweep of the apartment to make sure no other adults were present. *Id.* at 580. Officers later obtained a search warrant, with the resulting search yielding "bags with marijuana, scales, 9mm ammunition, and a 9mm handgun." *Id.* The defendant argued that officers would not have found the firearm and ammunition but for their unlawful entry into the apartment. *Id.* at 581. The Eighth Circuit found the firearm and ammunition admissible because "[t]he officers had sufficient evidence to support the issuance of the [search] warrant" prior to the warrantless entry. *Id.* at 583. While officers included information gained in the warrantless entry in the warrant application, the court found the officers had sufficient information "regardless of the later inclusion

of the information that marijuana was present in the apartment." *Id.* The court thus rejected the defendant's argument that "officers exploited their presence in the apartment to obtain the necessary information added to the search warrant affidavit." *Id.*

Defendant argues the inevitable discovery doctrine is inapplicable to this case because law enforcement's actions "rise to the level of offensiveness" the Eighth Circuit found in *United States v. Madrid*. (Doc. 12-1 at 3.) In *Madrid*, the Eighth Circuit found "the inevitable discovery doctrine is inapplicable to a warrantless search when police officers exploit their presence in the home." *United States v. Madrid*, 152 F.3d 1034, 1041 (8th Cir. 1998.) In *Madrid*, law enforcement "search[ed] the cushions of a sofa in the living room, . . . searched the [occupants], took [the occupants'] pictures, emptied [the occupants'] pockets into plastic bags marked 'evidence,' required them to sit in the living room, and did not permit them to talk to one another." *Id.* at 1036.

The case at bar much more closely resembles *Sallis* than *Madrid*. In the case at bar, even though officers entered the residence without permission, they conducted a protective sweep only to determine if other people were present who might pose a threat to officer safety. (Bovy Hr'g Test.) The officers were justified in entering the residence for the purpose of making such a protective sweep because of the reports of Defendant potentially assaulting someone with a shotgun. As stated above, securing the residence from the outside could have proved dangerous because of Defendant's reported possession of a weapon that could have been used offensively from the interior of the residence or against people inside the residence. Defendant's Exhibit 7 shows prior law enforcement interaction with Defendant in which officers found a bomb at Defendant's residence. (Doc. 56 at 6.) Law enforcement could consider this when determining how to safely secure the residence and whether the situation presented any exigencies. Officers' protective sweep of Defendant's residence is much less invasive than law enforcement's actions in *Madrid*. *See Madrid*, 152 F.3d at 1036. Furthermore, law

enforcement did not exploit their presence in Defendant's apartment by gathering information then used in the application for a search warrant. Officers in *Madrid* included information obtained from the illegal entry, seizure, and search of the defendant's home in the affidavit supporting the warrant. *Id.* at 1040. Officers in the case at bar had sufficient information for the search warrant application prior to entering Defendant's residence and did not include any additional information based on their observations upon entering Defendant's residence. (Gov. Ex. 1.) Thus, the inevitable discovery doctrine is applicable and the Court should not suppress the shotgun. I also note that even though Defendant complains about the alleged invasiveness and length of the detention, the officers' presence did not result in the discovery of any evidence or statements from persons allegedly detained.

### 2. *The shotgun was properly seized pursuant to the search warrant.*

Defendant argues law enforcement improperly seized a shotgun from his residence because the firearm does not match the search warrant's description of property to be seized. (Doc. 12-1 at 4.) The warrant authorizing the seizure of a shotgun described the property to be seized as "[a] long barrel firearm described as a shotgun with a black barrel and brown colored stock, shotgun ammunition, and any other long barrel firearm." (Gov. Ex. 1 at 1.) The seized shotgun has a barrel length of 17-7/8 inches, qualifying it as a "short-barreled shotgun" as described below. 18 U.S.C. § 921(a)(6) (2019) (defining a short-barreled shotgun as "a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun . . . if such a weapon as modified has an overall length of less than twenty-six inches"); (Gov. Ex. 9 at 3.)

Although the shotgun does not exactly match the property described in the warrant, the difference between the seized shotgun and the described shotgun is not significant enough to make the seizure unconstitutional. A minor, unintentional discrepancy between property described in a search warrant and property seized by police officers acting in

33

good faith does not make the seizure of property unconstitutional. *Cf. Maryland v. Garrison*, 480 U.S. 79, 85 (1987). In *Garrison*, police executed a search warrant that described with adequate particularity the place to be searched and the property to be seized. *Id.* However, the warrant's description of the place to be searched was broader than necessary. *Id.* Police incorrectly believed there was only one apartment on the third floor of the building, and thus the search warrant authorized a search of the entire third floor. *Id.* In fact, the third floor contained two apartments, and the warrant therefore covered the correctly targeted apartment in addition to an inadvertently targeted apartment. *Id.* The Court found that "[p]rior to the officers' discovery of the factual mistake, they perceived [the suspect's] apartment and the third-floor premises as one and the same; therefore their execution of the warrant reasonably included the entire third floor." *Id.* at 88. The Court found the officers' search was constitutional because "the officers' conduct was consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Id.*

Similar to the police officers' efforts in *Garrison*, the officers in this case acted reasonably and in good faith when they seized the shotgun from Defendant's residence. Prior to Special Agent Saunders's report finding the seized shotgun is in fact a short-barreled shotgun, law enforcement had no information indicating the shotgun was a short-barreled shotgun. (Gov. Ex. 9 at 3.) Officer Thomas testified that he thought the shotgun appeared slightly shorter than models with which he was familiar, and thought the shotgun was possibly a youth model. (Thomas Hr'g Test.) However, this does not constitute factual information that would indicate to officers the search warrant did not authorize them to seize the shotgun. Importantly, the shotgun barrel is only one-eighth of an inch shorter than a long-barrel shotgun, a difference that an officer acting in good faith would reasonably be unable to perceive. (Gov. Ex. 9 at 3.) As such, I find the shotgun was properly seized pursuant to the search warrant.

34

### 3. Law enforcement's seizure of the shotgun was justified under the plain-view doctrine.

Defendant also argues the plain view doctrine does not justify seizure of the shotgun because it was not in plain view but was covered with a T-shirt. (Doc. 12-1 at 4.) However, the seizure was justified because the plain view doctrine does not require that discovery of evidence be inadvertent, the shotgun was found within the scope of a valid search and its incriminating character was immediately apparent. *Horton v. California*, 496 U.S. 128, 130, 139 (1990) (holding that "the warrantless seizure of evidence of crime in plain view" is not unconstitutional even if discovery of the evidence is not inadvertent). For evidence to be properly seized pursuant to the plain view doctrine, the item must be within the scope of the search warrant, in plain view, and "its incriminating character must also be 'immediately apparent,'" but the discovery need not be inadvertent. *Id.* at 130, 135-37 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971); citing *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987)).

The shotgun was within the scope of the search warrant because it was found in the residence where police were authorized to conduct a search (Gov. Ex. 1 at 1), and it was found in an area of the house that could hold a long gun. Police photos taken during the search show the shotgun placed upright in a large bowl of cat food, with the butt of the shotgun placed in the bowl and the barrel resting against the wall. (Gov. Ex. 3 at 12-13.) Officer Thomas testified that when he found the shotgun, its barrel was partially covered by a T-shirt, but he could see the butt of the gun and could see this was obviously a shotgun. (Thomas Hr'g Test.) Lastly, the shotgun's incriminating character was immediately apparent to police officers because they were aware of Defendant's felon status prior to the search's conclusion. *See* 18 U.S.C. § 922(g)(1) 2019 (making it illegal for "any person . . . who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce,

35

any firearm or ammunition"); (Bovy Hr'g Test.)  Whether officers could tell the shotgun was a sawed-off shotgun is immaterial to the validity of law enforcement's seizure.  Given Defendant's felon status, any firearm in Defendant's residence would have had an immediately apparent incriminating character making it subject to seizure.

    **4.**    ***The search warrant sufficiently described Defendant's residence.***

The search warrant sufficiently described Defendant's residence because the search warrant's description of the location to be searched allowed law enforcement to find the residence "with reasonable effort," and there was no "reasonable probability that another premise might be mistakenly searched."  *Lyons v. Robinson*, 783 F.2d 737, 738 (8th Cir. 1985) (quoting *United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979)).  Defendant argues all evidence found during the search of Defendant's residence should be suppressed because the address the search warrant authorized police to search, 1005 1/2 West Mullan Avenue, does not describe his residence and the described residence does not exist.  (Doc. 12-1 at 5; Gov. Ex. 1 at 1.)  Defendant further argues the warrant incorrectly identified the apartment as located in a "beige" house when the house is not beige.  (*Id.*)  Defendant argues these two alleged inaccuracies justify the Court suppressing all evidence seized in the search of Defendant's residence.  (Doc. 12-1 at 5.)

The Fourth Amendment to The United States Constitution requires that warrants "particularly describ[e] the place to be searched."  U.S. Const. amend. IV.  The Eighth Circuit's test for determining whether a warrant describes the place to be searched with sufficient particularity is whether the description "enable[s] the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched."  *Lyons*, 783 F.2d at 738 (quoting *Gitcho*, 601 F.2d at 371).  In *Lyons*, the Eighth Circuit, in upholding a search warrant, considered the circumstances surrounding the warrant and determined the misstated address "was not misleading or confusing."  *Id.*  In particular, the Court noted

the risk of a mistaken search is particularly low when the same officer applied for and executed the search warrant. *Id.* (citing *United States v. McCain*, 677 F.2d 657, 661 (8th Cir. 2005)).

In this case, the search warrant sufficiently described the place to be searched. Officer Bovy both applied for and executed the search warrant, thus limiting the risk of a mistaken search. *Id.*; (Doc. 23-2 at 2); (Gov. Ex. 1 at 4.) Defendant does not provide evidence supporting his assertions that the address on the search warrant was incorrect or the color was incorrectly described,[4] but even assuming Defendant's assertions are correct, the search warrant still sufficiently described the place to be searched. Officer Bovy had been at Defendant's residence shortly before completing the search warrant application, he had met with eyewitnesses who described where Defendant's residence was, and he was therefore familiar with the residence's location. There was almost no risk he would mistakenly search another residence. (Doc. 23-2 at 1-2.) As such, I find the warrant sufficiently described the place to be searched and evidence obtained during the search should not be suppressed.

## C.    *Issues Regarding the Short-barreled Shotgun*

Defendant offers four arguments in support of his motions to dismiss Counts 1 and 2 described in the indictment. (Doc. 2; Doc. 14; Doc. 17.) First, Defendant argues 26 U.S.C. Section 5845(a)(1) and 18 U.S.C. Section 921(a)(6) do not provide him proper notice that possessing a shotgun that has a barrel not of uniform length is an illegal act. (Doc. 14-1 at 2.) 26 U.S.C. Section 5845(a)(1) includes in the definition of "firearm" "a shotgun having a barrel or barrels of less than 18 inches in length." 18 U.S.C. Section 921(a)(6) defines "short-barreled shotgun" as "a shotgun having one or mare barrels less

---

[4]I have reviewed the photographs in Exhibit 3, including those that show the exterior of the residence. I conclude the exterior is sufficiently described as "beige." This is not a case where law enforcement described a pink house and searched a purple one.

than eighteen inches in length." Second, Defendant argues the Second Amendment protects short-barrel shotguns. (*Id.* at 3-5.) Third, Defendant argues the National Firearms Act is unconstitutional because it violates the Second and Ninth Amendments. (*Id.* at 5-6.)

The Government argues regulations prescribing the proper measurement methods for compliance with 26 U.S.C. Section 5845(a)(1) and 18 U.S.C. Section 921(a)(6) provide fair notice. (Doc. 30 at 2-4.) The Government also argues that the Second Amendment does not protect short-barrel shotguns, as the Eighth Circuit found in *United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) and the United States Supreme Court found in *District of Columbia v. Heller*, 554 U.S. 570 (2008). (Doc. 30 at 4-5.) The Government further argues that the National Firearms Act is constitutional, as the United States Supreme Court found in *United States v. Miller*, 307 U.S. 174 (1939). (Doc. 30 at 5.)

### 1. 26 U.S.C. Section 5845(a)(1) and 18 U.S.C. Section 921(a)(6) provided Defendant fair notice.

In this case, Agent Toy's report and photographs show that the shotgun barrel is at all points less than eighteen inches in length even though it varies slightly because of the way it appears to have been cut. I find Sections 5845(a)(1) and 921(a)(6) provided fair notice to Defendant. While the Eighth Circuit has not issued an opinion addressing whether 26 U.S.C. Section 5845(a)(1) and 18 U.S.C. Section 921(a)(6) provide fair notice as to prohibited activities, the Ninth and Eleventh Circuits have upheld the measurement methods prescribed in these statutes and the implementing regulation, 27 C.F.R. Section 479.11. *See United States v. Calise*, 996 F.2d 1019, 1022 (9th Cir. 1993); *United States v. Griffin*, 705 F.2d 434, 436 (11th Cir. 1983). The Seventh Circuit has also found Section 5845 provides fair notice as to prohibited activities:

> In the present case, the statute gave Lim more than adequate warning of what is prohibited by defining the minimum length of both the overall

shotgun and its barrel. In contrast to the statute at issue in *Powell*, section 5845 supplies the specific measurements that will bring a shotgun within the proscribed zone. Contrary to Lim's argument, "barrel" is not an inherently confusing term. Although, as Lim suggests, there may be marginal situations in which the legality of a sawed-off shotgun will depend on the particular method used to measure the barrel length, this is not one of them: Lim's shotgun, with an overall length of 24 inches and barrel length of 14 1/2 inches, fell well short of the published minimum lengths. Just as in *Powell*, Lim "has been given clear notice that a reasonably ascertainable standard of conduct is mandated; it is for him to insure that his actions do not fall outside the legal limits." *Id.* at 92, 96 S. Ct. at 320. Furthermore, the pertinent regulation serves to dispel any doubt about the legality of a shotgun in marginal cases where the length of the barrel falls closer to the minimum. The Supreme Court has held that "it is [not unfair] to require that one who deliberately goes perilously close to an area of proscribed conduct shall take risk that he may cross the line." *Boyce Motor Lines*, 342 U.S. at 340, 72 S. Ct. at 331. Because the statute provides fair warning of the type of firearm that cannot be possessed unless it is properly registered, and the statutory definition and regulation prevent arbitrary application, section 5861(d) is not unconstitutionally vague as applied to Lim's possession of the sawed-off shotgun.

*United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006).

In determining whether a statute provides fair notice, the applicable standard is whether the statute "define[s] the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402-03 (2010). "Vagueness challenges that do not involve First Amendment freedoms must be analyzed as applied to the specific facts of the case at hand." *Lim*, 444 F.3d at 915.

The case at bar falls well within the rationale of *Lim* and *Boyce Motor Lines*. Although the barrel is irregular, it appears that even at its longest it is less than eighteen inches. (Gov. Ex. 9 at 3, 14.) The Court is not presented with a case where the shotgun was manufactured or cut at an angle such that part of the barrel is at least eighteen inches

39

long and part is shorter. Here, Defendant's shotgun not only came "perilously close to an area of proscribed conduct," it crossed the line. From the photo on page fourteen of the Government's Exhibit 9, it appears the entire barrel is less than the minimum statutory length. (*Id.* at 14.)

ATF Firearms Enforcement Officer Toy conducted the technical examination of the firearm at issue in this case and found the barrel to be 17-7/8 inches in length. (*Id.* at 3.) As the Seventh Circuit found in *Lim*, I find Section 5845 provided Defendant with adequate notice as to prohibited activities because the statute "supplies the specific measurements that will bring a shotgun within the proscribed zone." *Lim*, 444 F.3d at 916; 26 U.S.C. § 5845(a)(1) (2017). Although the Eighth Circuit has not addressed Defendant's vagueness claim regarding Section 921(a)(6), I find the similarities between Section 921(a)(6) and Section 5845(a)(1) substantial enough that, if Section 5845(a)(1) provides a person with notice, Section 921(a)(6) does as well.[5] Therefore, I find Sections 5845(a)(1) and 921(a)(6) provided Defendant fair notice that possession of the shotgun seized during the search of Defendant's residence was an illegal act.

### 2. *The Second Amendment does not protect Defendant's possession of a short-barreled shotgun.*

The Second Amendment does not protect Defendant's possession of a short-barreled shotgun because a short-barreled shotgun is not "typically possessed by law-abiding citizens for lawful purposes," and is thus not afforded Second Amendment protection. *Heller*, 554 U.S. at 625. *Heller* specifically identified "short-barreled shotguns" as firearms that do not receive Second Amendment protection. *Id.* As such,

---

[5]*Compare* 26 U.S.C. § 5845(a)(1) (including in the definition of "firearm" "a shotgun having a barrel or barrels of less than 18 inches in length") and 18 U.S.C. § 921(a)(6) (defining a "short-barreled shotgun" as "a shotgun having one or more barrels less than eighteen inches in length.").

I find the Second Amendment does not protect Defendant's possession of a short-barreled shotgun.

### 3. The United States Supreme Court has found the National Firearms Act Constitutional.

As Defendant acknowledges in his brief, *United States v. Miller* found the National Firearms Act constitutional as it does not usurp police powers reserved to the states. *Miller*, 307 U.S. at 178; (Doc. 14-1 at 5-6). Defendant's motion and brief suggest he acknowledges this Supreme Court precedent and seeks only to preserve the issue for appeal. (Doc. 14 at 2; Doc. 14-1 at 5-6.) As such, Defendant's motion to dismiss should be denied.

## D. The Government has no duty to present exculpatory evidence at a grand jury proceeding.

Defendant argues the case against him should be dismissed because the Government presented the grand jury with materially false information and withheld information. (Doc. 22 at 1.) A grand jury is not an adversarial proceeding, and a defendant is not entitled to have exculpatory evidence presented to it. *United States v. Williams*, 504 U.S. 36, 51-53 (1992); United *States v. Calandra*, 414 U.S. 338, 343-44 (1974). The Government argues that it did not act improperly when presenting evidence to the grand jury because the Government is not required to present the grand jury with exculpatory evidence. (Doc. 34 at 3.)

The lack of any requirement that a grand jury hear exculpatory evidence is decisive. Defendant argues the grand jury did not hear all relevant information. (Doc. 22 at 4.) For example, Defendant argues that Special Agent Saunders did not tell the grand jury that Ms. Borntreger contradicted Ms. Latham's claim that Defendant pointed a firearm at Ms. Latham and Mr. Cole. (*Id.* at 2.) Defendant also argues that Mr. Cole testified before the grand jury that Defendant did not point a firearm at him, which

41

contradicted his prior statements that Defendant had pointed a gun at him. (*Id.* at 3.) However, as Defendant notes, he "has no right to have evidence favorable to him . . . presented to a grand jury. (*Id.* at 5 (citation omitted).) Furthermore, two witnesses, Ms. Miller and Ms. Randall did, in fact, provide exculpatory grand jury testimony. (Gov. Ex. 4 at 8; Gov. Ex. 5 at 5-6, 8.) Both testified that Defendant not only did not point a shotgun at anyone, but he also did not even have a shotgun in his possession. (Gov. Ex. 4 at 8; Gov. Ex. 5 at 5-6, 8.)

Defendant also argues Ms. Latham provided the grand jury with false information that justifies dismissal. For example, Defendant argues Ms. Latham testified before the grand jury that her daughter was "freaking out" during the alleged incident involving Defendant. (Doc. 22 at 2.) Defendant also argues that Ms. Latham testified she had no recent criminal record, but Iowa court records indicate this is not true. (*Id.* at 3.)

Defendant's arguments attempt to portray the Government as improperly pursuing indictments related to an alleged assault, but the grand jury indicted Defendant for "Possession of a Firearm by a Felon" and "Possession of a National Firearms Act Short-Barreled Shotgun Not Registered to Possessor." (Doc. 2 at 1-2.) Whether Defendant pointed a gun at anyone may have been relevant to probable cause for the assault, but it is immaterial to these counts. Thus, whether the Government presented the grand jury with information suggesting Defendant did not point a gun at anyone had no bearing on the grand jury's decision to charge Defendant with the two counts currently before the Court. As such, I find the grand jury proceedings do not warrant dismissal of either count against Defendant.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend Defendant's Motion to Suppress and Request for *Franks* Hearing (**Doc.11**); Defendant's Motion to Suppress

(**Doc.12**); Defendant's Motion to Dismiss (**Doc. 14**); and Defendant's Second Motion to Dismiss (**Doc. 17**) all be **denied**.

        **To allow for an expedited final ruling**, objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) must be filed within **SEVEN (7) days** of the service of a copy of this Report and Recommendation. *See United States v. Vasquez-Martinez*, No. 6:05CR60016-001, 2006 WL 376474, at *8 (W.D. Ark. Feb. 9, 2006) (seven days for objections); *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 925 (D. Minn. 2018) (referral order included order for expedited review of R. & R.).

        Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 15th day of November, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa