# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

LEVI FARREN MILLER,

        Defendant.

No.  CR19-2031-LTS

**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION**

      This matter is before me on a Report and Recommendation (R&R) (Doc. No. 57) in which the Honorable Mark A. Roberts, United States Magistrate Judge, recommends that I deny defendant's motion (Doc. No. 11) to suppress/request for *Franks* hearing, motion (Doc. No. 12) to suppress, motion (Doc. No. 14) to dismiss Counts 1 and 2 of the Indictment and second motion (Doc. No. 17) to dismiss.  Miller filed timely objections (Doc. No. 62) to the R&R.

## I.  BACKGROUND

### A.  Procedural History

      On May 8, 2019, the grand jury returned an Indictment (Doc. No. 2) charging Miller with two counts: possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) and possession of a National Firearms Act short-barreled shotgun not registered to possessor in violation of 26 U.S.C. § 5861(d).

      On August 1, 2019, Miller filed a motion (Doc. No. 11) to suppress/request for a *Franks* hearing, a motion (Doc. No 12) to suppress and a motion (Doc. No. 14) to dismiss Counts 1 and 2 of the Indictment.  He then filed a second motion (Doc. No. 17) to dismiss on August 12, 2019.   The Government filed resistances on August 19, 2019.  *See* Doc.

Nos. 30, 32, 33, 34. Miller filed a reply (Doc. No. 41) regarding his motion to suppress/request for *Franks* hearing.

Judge Roberts held a hearing on October 7, 2019. Doc. No. 53. The Government presented testimony from Officers Jeremy Berryman, Alexander Bovy, Steven Thomas and Joseph Saunders of the Waterloo Police Department. Doc. No. 53-1. Judge Roberts admitted Government Exhibits 1 through 11. He also admitted Defense Exhibits 1 through 6. *Id.* Defendant later submitted Exhibit 7 and the parties submitted post-hearing briefs. *See* Doc. Nos. 55, 56.

Judge Roberts issued his R&R (Doc. No. 57) on November 15, 2019. Miller filed his objections (Doc. No. 62) on November 25, 2019. Trial is currently set to commence during the two-week period beginning January 21, 2020. *See* Doc. No. 61.

## B.    *Relevant Facts*

Judge Roberts made the following findings of fact:

> This case involves Defendant's alleged possession of a short-barreled shotgun. Defendant's neighbor, Takeela Latham, called law enforcement to report Defendant possessing a shotgun and yelling at Ms. Latham for removing items from her porch and placing them in Defendant's truck. (Gov. Ex. 1 at 4.) Ms. Latham claimed Defendant pointed the shotgun at her and Jarrell Cole, after which she and Mr. Cole ran back into Ms. Latham's apartment. (*Id.*) Officer Alexander Bovy, a police officer with the Waterloo Police Department, was the first to respond to the call regarding the alleged confrontation between Ms. Latham and Defendant. Defendant resided in the upstairs apartment of 1005 West Mullan Avenue in Waterloo, Iowa. (Bovy Oct. 7, 2019 Hr'g Test.) Ms. Latham and her daughter resided on the ground floor of the same residence. (Gov. Ex. 1 at 4.)
>
> ### A.    *Officers Bovy and Payne's Initial Contact with Ms. Latham's Daughter and the Daughter's Aunt at 1005 West Mullan Avenue*
>
> Officer Bovy arrived at 1005 West Mullan Avenue at approximately 6:20 p.m. on February 3, 2019. (*Id.*) When Officer Bovy first arrived at the residence, he walked to the back of the residence but did not see anyone

(Doc. 24 at 1.) Officer Payne arrived at the residence shortly after Officer Bovy. (*Id.*; Berryman Hr'g Test.) Officers Bovy and Payne then knocked on the back door at 1005 West Mullan Avenue to contact residents. (Doc. 24 at 1; Def. Ex. 2 at 5:45.)

After knocking on the back door, Officers Payne and Bovy first made contact with a girl who identified herself as a ten-year-old resident who lives at 1005 West Mullan Avenue with her "auntie" ("the aunt"). (Def. Ex. 2 at 5:50.) The girl later identified herself as Ms. Latha[m]'s daughter, and stated that Ms. Latham left with her friends to get some food. (*Id.* at 7:45-8:00.) The aunt consented to Officers Bovy and Payne entering the apartment. (*Id.* at 6:18.) Officer Bovy asked if the aunt heard people yelling, but she denied having heard anything. (*Id.* at 6:30-6:46.)

**B.      Officers Bovy and Payne's Contact with Ms. Latham and Defendant's Neighbor Emmitt Johnson**

Officers Bovy and Payne next contacted Ms. Latham and Defendant's neighbor, Emmitt Johnson. The officers knocked on Mr. Johnson's door to initiate contact. (*Id.* at 10:22.) Mr. Johnson initially denied knowledge of an altercation, stating he had only recently arrived at his residence (*Id.* at 10:40.) Mr. Johnson eventually acknowledged he heard Defendant and Defendant's wife Sarabeth Miller arguing but stated no one else was outside and there was no physical altercation. (*Id.* at 10:40-11:35.)

**C.      Law Enforcement Contact with Defendant, Ms. Miller, and Ms. Randall**

In addition to Defendant, Ms. Miller and Michele Randall also reside at 1005 ½ West Mullan Avenue. (Gov. Ex. 1 at 4.) Officer Bovy knocked on Defendant's apartment door, and Defendant answered. (Bovy Hr'g Test.) Defendant spoke with the officers about a number of issues, including a prior incident involving the discovery of a pipe bomb at a different residence of Defendant and an altercation where Defendant asserted he had been beaten by the police. (*Id.*) Defendant, Ms. Miller, and Ms. Randall stated they all went to the back of the residence after hearing a loud noise because they were concerned someone was damaging their truck in the back parking lot. (Gov. Ex. 1 at 4.) Ms. Miller told Officer Bovy she was carrying a broken pool stick and Defendant was carrying a large knife when they checked the truck. (*Id.*) Defendant also

stated he was carrying a large fixed blade knife when he checked the truck with Ms. Miller. (Doc. 23-2 at 1.) Ms. Miller claimed they walked past Ms. Latham behind the residence, where Ms. Latham was in an argument with an unidentified male. (Gov. Ex. 1 at 4.)

Officer Bovy requested Defendant consent to a search of the residence, but Defendant declined. (Bovy Hr'g Test.) Officer Bovy then spoke with Officer Thomas, who had been dispatched to 123 Elmwood Street, where Ms. Latham was located, at approximately 6:45 p.m. (Thomas Oct. 7, 2019 Hrg' Test.) While at 123 Elmwood Street, Officer Thomas spoke with Ms. Latham, Mr. Cole, Chelsea Cole, and Kayla Borntreger, who all reported seeing Defendant with a gun. (Gov. Ex. 1 at 4; Bovy Hr'g Test.) Ms. Borntreger and Ms. Cole state Defendant was wearing a red shirt and had dreadlocks pulled into a ponytail. (Gov. Ex. 1 at 4.) Officers Thomas and Bovy called their sergeant supervisor, who advised them to obtain a search warrant. (Thomas Hr'g Test.)

After deciding to obtain a search warrant, law enforcement secured the residence to make sure no one was present other than those with whom law enforcement already made contact, Ms. Miller, Ms. Randall, and Defendant. (Id.) The officers decided that securing the residence required them to enter and conduct a protective sweep of the residence, only looking in areas large enough for people to hide. (Bovy Hr'g Test.)

Officers Berryman and Bovy testified they believed Defendant, Ms. Miller, and Ms. Randall could have left the residence if they desired but did not explicitly tell Defendant and the other residents they were free to leave. (Id.; Berryman Hr'g Test.) Officer Berryman testified he was not told Defendant and the residents were required to stay. (Berryman Hr'g Test.) Special Agent Saunders, who was not present when law enforcement secured the residence, reviewed video of officers securing the residence and could not recall officers instructing the residents that they were free to leave if they wanted. (Saunders, Oct. 7, 2019 Hr'g Test.) Defendant briefly left the residence to look at his truck. Officer Berryman accompanied him as a precautionary measure for officer safety. (Berryman Hr'g Test.) If Defendant, Ms. Miller, or Ms. Randall left the residence, law enforcement would not have allowed them back in. (Bovy Hr'g Test.) However, law enforcement did not tell Defendant, Ms. Miller, or Ms. Randall they were free to leave with the condition that they could not reenter the residence until a search was completed.

After informing Defendant, Ms. Miller, and Ms. Randall that law enforcement intended to obtain a search warrant for the residence, Ms. Miller told Officer Bovy she was willing to go to the police department and provide a statement. (Bovy Hr'g Test.) Defendant and Ms. Randall were unwilling to provide statements. (*Id.*) Officer Bovy took Ms. Miller to the Waterloo Police Department so she could make a statement. (*Id.*) Officer Thomas returned to 123 Elmwood Street to bring Ms. Latham, Mr. Cole, Ms. Borntreger, and Ms. Cole to the Waterloo Police Department for interviews. (Doc. 23-1 at 1.) Each witness except Ms. Miller stated Defendant was holding a shotgun when he exited his residence. The witnesses provided somewhat differing accounts of whether Defendant pointed the shotgun at the witnesses, whether Defendant could see the witnesses, and where the witnesses were located when Defendant exited his apartment while holding the shotgun.

### D.  *Police Interview with Ms. Latham*

Officer Thomas interviewed Ms. Latham at the Waterloo Police Department on February 3, 2019. (Doc. 23-1 at 1; Def. Ex. 2, video of Ms. Latham.) During this interview, Ms. Latham described plans for Ms. Borntreger to give her a ride to the grocery store prior to the alleged incident. (Def. Ex. 2, video of Ms. Latham, at 1:05.) Ms. Latham stated that as she was leaving her apartment to get into Ms. Borntreger's car, Ms. Latham noticed a suitcase sitting on her porch, directly outside the back door that leads into her kitchen. (*Id.* at 1:18.) Ms. Latham believed this suitcase belonged to her upstairs neighbors, including Defendant. (*Id.* at 1:45.) Ms. Latham asked Mr. Cole to place the suitcase in Defendant's truck located behind the apartment building. (*Id.*) She then stated that Defendant exited his apartment while Ms. Borntreger was still sitting in her car and Mr. Cole and Ms. Latham had not yet reached Ms. Borntreger's car (*Id.* at 2:30-2:53.) Ms. Latham claimed to have witnessed Defendant and an unidentified woman walking towards the pickup truck. (*Id.* at 3:10.) Ms. Latham stated that Defendant, carrying a shotgun, pointed it directly at her and Mr. Cole. (*Id.* at 3:45.) She stated she could hear Defendant say, "These motherfuckers," as he walked toward the pickup truck. (*Id.* at 3:10.) She stated this scared her, so she and Mr. Cole started to quickly walk back to her apartment. (*Id.* at 3:28.) Ms. Cole followed closely behind them from the direction of Ms. Borntreger's car, although the interview does not provide a clear picture of whether Ms. Cole was sitting inside Ms. Borntreger's car prior to walking towards Ms. Latham's apartment or had walked with Mr. Cole and Ms. Latham from Ms.

Latham's apartment towards Ms. Borntreger's car. (*Id.*). Ms. Latham stated that Defendant relaxed his shotgun's position, allowing the barrel to angle down towards the ground as she and Mr. Cole hurriedly walked back to her apartment. (*Id.* at 3:40.)

Ms. Latham described Defendant's shotgun as "brown" but stated Ms. Borntreger had a better angle to see the gun because she remained outside while the others hurried towards Ms. Latham's apartment. (*Id.* at 7:00-7:10.) Ms. Latham reiterated that Ms. Borntreger was in a car during the alleged incident, noting she could have driven away if Defendant started shooting. (*Id.* at 7:20.)

Ms. Latham later stated she had the door to Ms. Borntreger's car partially open when she heard Defendant come down the stairs from his apartment. (*Id.* at 7:38.) This differed from her prior statement that she was not by the vehicle when Defendant started to come down. (*Id.* at 3:20.)

Ms. Latham acknowledged she has a poor relationship with Defendant and dislikes him. (*Id.* at 8:55.) She noted this was not her first encounter with Defendant, and she had previously called the police about her neighbors. (*Id.* at 8:15.) She had previously called the police to complain that Defendant purposefully moved the bathtub in his apartment and continuously ran the water, causing her daughter's bedroom ceiling to collapse. (*Id.* at 8:28.) She had also called the police to complain that Defendant yelled racial slurs at her children. (*Id.* at 8:44.)

### E.   *Police Interview with Mr. Cole*

Officer Thomas interviewed Mr. Cole at the Waterloo Police Department on February 3, 2019. (Doc. 23-1 at 1; Def. Ex. 2, video of Mr. Cole.) During this interview, Mr. Cole described Defendant descending the stairs from his apartment with a shotgun in hand. However, he did not clearly describe how Defendant held the shotgun or who was present with him during the alleged incident.

Mr. Cole stated he and Ms. Latham were leaving her apartment building when she noticed a bag that did not belong to her on her porch. (Def. Ex. 2, video of Mr. Cole, at 1:05) Ms. Latham asked Mr. Cole to move the bag to her neighbor's pickup truck. (*Id.* at 1:35) Mr. Cole did not state whether he actually placed the suitcase in the pickup truck. (*Id.*)

He stated Defendant's apartment windows were open, which allowed Defendant to hear him talking with Ms. Latham. (*Id.* at 1:45.)

Mr. Cole stated "they" came downstairs, referring to Defendant and at least one other person, but he did not identify who accompanied Defendant. (*Id.* at 1:45.) Defendant was allegedly carrying a shotgun as he walked down the stairs from his residence, saying, "Motherfuckers, motherfuckers, motherfuckers." (*Id.*; *Id.* at 2:30, 3:00.) Mr. Cole described how Defendant held the shotgun, stating Defendant "had [the shotgun] like this," as he mimicked how Defendant held the shotgun. (*Id.* at 1:50.) Mr. Cole positioned his hands to demonstrate holding the shotgun in both hands across his body. The butt of the weapon is not raised to his shoulder. Mr. Cole demonstrated holding a shotgun in a position of readiness to fire, not as one might carry a shotgun to merely transport it or to avoid a discharge. (*Id.*) Mr. Cole stated Defendant "pointed" the shotgun but did not state whether Defendant pointed the shotgun at any individual. (*Id.* at 2:30.) Mr. Cole described the shotgun as having a black barrel and brown, "wood-like" stock. (*Id.* at 2:00-2:06) He described Defendant as wearing a red shirt and having dreadlocks pulled back into a ponytail. (*Id.* at 2:10.)

Mr. Cole stated that after seeing Defendant descend the stairs with the shotgun, "we all hurried back in the house." (*Id.* at 2:45.) He did not state who is included in the term "we." (*Id.*) Mr. Cole stated he could hear Defendant walk back up to his apartment after Mr. Cole returned to Ms. Latham's apartment. (*Id.* at 3:55.)

Mr. Cole acknowledged an existing animosity between Ms. Latham and her friends and Defendant. (*Id.* at 3:20.) He stated that Defendant has called Ms. Latham and her friends racial slurs in the past but stated this was the first time he saw Defendant carrying a gun. (*Id.*)

### F.    *Police Interview with Ms. Cole*

Officer Thomas interviewed Ms. Cole at the Waterloo Police Department on February 3, 2019. (Doc. 23-1 at 1; Def. Ex. 2, video of Ms. Cole.) Ms. Cole described how she witnessed the alleged incident from inside Ms. Latham's porch.

Ms. Cole stated she and Ms. Latham were on Ms. Latham's porch, Ms. Borntreger was in her car, and Ms. Cole was walking from inside Ms.

Latham's apartment towards the porch immediately before the alleged incident. (Def. Ex. 2, video of Ms. Cole, at 1:05; 2:20.) Ms. Cole stated Defendant held a gun as he stood outside with two women, repeatedly saying, "Motherfuckers." (*Id.* at 1:15; 2:10) Ms. Cole did not elaborate on the term "outside," so it is unclear whether this means outside on the porch, outside by the pickup truck, or in another location outside of the apartment building. She observed Defendant and the two women from Ms. Latham's porch, as she could look through the porch's glass door. (*Id.* at 2:00)

Ms. Cole described the gun Defendant held as a brown shotgun. (*Id.* at 1:35; 3:15.) She stated she was unsure whether Defendant pointed the gun at anyone. (*Id.* at 2:25.) After seeing Defendant outside with a gun, Ms. Cole stated that she and Ms. Latham returned to Ms. Latham's apartment, and Defendant walked up the stairs back to his apartment. (*Id.* at 2:40.)

Ms. Cole described Defendant as wearing a red shirt and black or blue sweatpants. (*Id.* at 1:40.) She further described Defendant as having his hair pulled back in a ponytail. (*Id.*)

Officer Bovy's affidavit in support of the search warrant incorrectly states, "I spoke with" Ms. Cole. (Gov. Ex. 1 at 4.) Officer Thomas actually spoke with her. (*Id.*; Bovy Hr'g Test.) The officers' testimony was contradictory regarding how this misstatement occurred. Officer Bovy stated that he and Officer Thomas each typed a portion of the document. Officer Bovy stated that Officer Thomas typed "I spoke with" Ms. Cole, but Officer Bovy signed the document so it should have stated, "Officer Thomas spoke with" Ms. Cole. (Bovy Hr'g Test.) Officer Thomas stated Officer Bovy typed while he dictated. (Thomas Hr'g Test.)

## G.    *Police Interview with Ms. Borntreger*

Officer Thomas interviewed Ms. Borntreger at the Waterloo Police Department on February 3, 2019 (Doc. 23-1 at 1; Def. Ex. 2, video of Ms. Borntreger.) Ms. Borntreger's statements did not align with aspects of the other witnesses' statements, especially regarding where witnesses were located during the incident.

Ms. Borntreger stated Ms. Latham called her for a ride to the grocery store. (Def. Ex. 2, video of Ms. Borntreger, at 1:05.) She then drove to

Ms. Latham's apartment and parked behind the apartment. (*Id*. at 1:15.) She entered Ms. Latham's apartment and waited for Ms. Latham to finish getting ready. (*Id*. at 1:20.) Ms. Borntreger stated Ms. Latham saw Defendant's suitcase on the porch as she, Ms. Latham, Mr. Cole, and Ms. Cole walked out of Ms. Latham's apartment. (*Id*. at 1:20; 4:45.) Ms. Latham and Mr. Cole then put the suitcase into the truck parked behind the apartment. (*Id*. at 1:35.) Ms. Latham and Mr. Cole then returned to Ms. Latham's apartment. (*Id*.)

Shortly after Ms. Latham and Mr. Cole returned to the house, Ms. Borntreger heard Defendant and two women come down the stairs outside of the apartment. (*Id*. at 1:42.) Ms. Borntreger stated that she, Ms. Latham, Mr. Cole, and Ms. Cole stayed in the front porch to watch Defendant and the two women. (*Id*. at 1:55.) She said that Defendant was carrying a gun while mumbling, "Fuck motherfuckers," and walking behind the apartment building. (*Id*. at 2:05; 3:00.) Ms. Borntreger told Officer Thomas that as Defendant walked around the apartment building, she, Ms. Latham, Mr. Cole, and Ms. Cole decided to exit the apartment building through Ms. Latham's back door and go to Ms. Borntreger's residence to call the police. (*Id*. at 2:15.)

Ms. Borntreger described the gun Defendant was holding as "a regular shotgun" with a wood-grain grip and stock and a black barrel. (*Id*. at 2:35-2:50.) She stated Defendant did not point the shotgun at anyone because Defendant could not see her or the other witnesses, as they all watched Defendant from inside Ms. Latham's porch. (*Id*. at 4:27-5:00.) Ms. Borntreger instead described Defendant as carrying the shotgun in a manner that would allow him to shoot quickly if necessary. (*Id*.)

Ms. Borntreger described one of the women with Defendant as approximately the same age as Defendant, with dark hair, while the other woman appeared to be several years older than Defendant. (*Id*. at 3:15.) The woman who was approximately the same age as Defendant wore a gray and white striped coat, while the older woman wore a gray or black T-shirt and jeans. (*Id*. at 3:40.)

Ms. Borntreger described Defendant as wearing a red T-shirt with the sleeves cut off and pants that were either camouflage or had another pattern. (*Id*. at 3:50.) She stated Defendant had dark hair in dreadlocks pulled into a ponytail. (*Id*. at 4:00.)

Officer Bovy's affidavit in support of the search warrant contains the same misstatement regarding Ms. Borntreger's interview as the misstatement regarding Ms. Cole's interview. Officer Bovy wrote "I spoke with" Ms. Borntreger, but Officer Thomas actually spoke with her. (Gov. Ex. 1 at 4; Bovy Hr'g Test.) The explanations for the discrepancy are the same as above. (Bovy Hr'g Test.; Thomas Hr'g Test.)

## H.     *Search of 1005 ½ West Mullan Avenue and Subsequent Arrest of Defendant*

After Ms. Miller provided a statement at the Waterloo Police Department, Officer Bovy drove her back to the residence. (Bovy Hr'g Test.; Gov. Ex. 1 at 1.) Officer Bovy then finalized the affidavit and presented it to a judge who issued a search warrant for 1005 ½ W. Mullan Avenue at approximately 9:36 p.m. (*Id.*) At the time Officer Bovy applied for the search warrant, he believed law enforcement was investigating a possible assault involving a shotgun. (Bovy Hr'g Test.) Officer Bovy thus sought the search warrant to find the firearm allegedly used in the assault. (*Id.*) Officer Bovy returned to the Waterloo Police Department to make a copy of the signed warrant, and then returned to the residence to execute the warrant. (*Id.*) The application describes Defendant "walking with a shotgun in his hands and cursing," as well as having "pointed the gun" at two people. (Gov. Ex. 1 at 4.)

Officer Bovy read the warrant to Defendant, Ms. Miller, and Ms. Randall when he returned to the residence, and the officers began the search. (*Id.*) Officer Thomas found a pump action shotgun with a black barrel and brown wood stock and foregrip propped against the door frame inside the kitchen. (Doc. 23-1 at 1; Gov. Ex. 3 at 12.) A T-shirt was covering part of the barrel, and the butt of the gun was in a pan filled with cat food. (Doc. 23-1 at 1; Gov. Ex. 3 at 12.)

Following the search, Defendant was placed under arrest. (Bovy Hr'g Test.; Doc. 24 at 2.) Upon arrest, Officer Bovy searched Defendant and found a red plastic straw with white powder residue and two plastic bags containing suspected methamphetamine. (Doc. 21-1 at 1; Doc. 24 at 2.) Defendant was indicted with two federal criminal counts, Possession of a Firearm by a Felon and Possession of a National Firearms Act Short-Barreled Shotgun Not Registered to a Possessor. (Doc. 2 at 1.)

## I. Conclusions from the Bureau of Alcohol, Tobacco, Firearms and Explosives Regarding the Shotgun Seized at 1005 ½ West Mullan Avenue

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") concluded the shotgun found in Defendant's residence is properly classified as a short-barreled shotgun as defined in 18 U.S.C. Section 921(a)(6). (Gov. Ex. 9 at 3.) Cody J. Toy, a Firearms Enforcement Officer with ATF, examined and tested the shotgun before sending a report to Special Agent Joseph Saunders classifying the firearm as a short-barreled shotgun. (Gov. Ex. 9.) Officer Toy measured the barrel length by placing the shotgun on a flat surface, closing the bolt, and inserting a cylindrical scale into the barrel's muzzle until the scale touched the bolt face. (*Id.* at 2.) Officer Toy measured the barrel and found it to be 17-7/8 inches long. (*Id.* at 2-3.) Photos show the barrel is not of uniform length, the entire barrel also appears to be less than eighteen inches long. (*Id.* at 14.)

Special Agent Joseph Saunders is a police officer with the Waterloo Police Department and a task force officer with ATF. (Saunders Oct. 7, 2019 Hr'g Test.) He was not directly involved in the search of Defendant's residence, but was the recipient of ATF's report on the seized shotgun. (Gov. Ex. 9 at 1.)

Doc. No. 57 at 4-15 (footnotes omitted).

## II. STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b).  Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard.  *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error").  As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## III.  DISCUSSION

### A.  Objections to Findings of Fact

Miller makes the following objections to the findings of fact:

- The lack of reference to Officer Bovy's testimony at the hearing that he deliberately omitted information from the warrant application that contradicted Latham's claim that Miller pointed the shotgun at her.[1]

---

[1] Bovy testified that he did not know Latham's claim was contradicted by any other evidence. *See* Doc. No. 63 at 16.  Any such evidence from Bovy was also not a part of Miller's preliminary showing and is therefore inappropriate to consider for purposes of Miller's request for a *Franks* hearing.  *See infra,* section III(B)(1)(a).  This objection is overruled.

- The suggestion that Borntreger's description of events is inconsistent with the other eyewitness statements. Ms. Cole's statement is consistent with Borntreger's that she did not recall seeing Miller point a gun at anyone and indicated she, Latham and Borntreger were inside the porch, not outside. Latham stated Borntreger had the best view of what occurred.[2]

- Any statement that the suitcase was on "porch" rather than the back "deck."[3]

- With regard to Bovy's interaction with Latham's daughter and the daughter's auntie, one of them said no one was yelling "here" (meaning back of the house) and there is only one door out of the upstairs apartment where Miller lives. Bovy had a discussion with dispatch asking them to contact Latham to determine where the guy she complained about came from because it sounded like she was in the apartment.[4]

- With regard to Bovy's interaction with Johnson, Johnson told Bovy that he saw Miller and his wife Sara outside his apartment, but there was no one else out there with them.[5]

- With regard to Miller's truck (which is actually his father-in-law's truck according to what Miller told Bovy when standing outside his apartment), Bovy's body cam shows the truck on the side of the house rather than the

---

[2] This objection is overruled. Ms. Cole stated Borntreger was in her car, not inside. *See* Def. Ex. 2, video of Ms. Cole. Borntreger is the only witness who stated they were all inside at the time Miller came to the back of the house.

[3] This objection is overruled. Latham and others refer to the area to the back of Latham's apartment as a porch rather than a deck. Borntreger is the only witness who refers to the front porch of Latham's apartment. *See* Def. Ex. 2.

[4] I do not find these facts to be material. This objection is overruled.

[5] I do not find this fact material. This objection is overruled.

back. Bovy also commented that he had been to this house before.[6]

- The omission that the police did not make a protective sweep when entering the apartment indicating the lack of concern that other people were present. He contends Defense Exhibit 7 shows that the police stayed in the living room and hallway with Miller, his wife and Ms. Randall while the warrant was obtained and that there were other rooms in the apartment.[7]

- The statement that all witnesses said they saw Miller holding a shotgun when he exited his apartment. Borntreger and Ms. Cole said they saw Miller with a gun, but were inside Latham's enclosed porch and saw the gun as he walked by.[8]

- That Latham said there was a suitcase on the porch outside her back door. Miller notes that there is an enclosed "porch" at the front of the house and that Borntreger and Ms. Cole said they were inside the "porch" when Miller walked by. Miller notes the "deck" at the back of Latham's apartment is open and the enclosed "porch" is at the front.[9]

- With regard to Mr. Cole's statement, the "porch" is at the front and the "deck" is in the back. The R&R is correct that it would be difficult if not impossible to see Miller come down the stairs from the back of the house

---

[6] Whether Bovy had been to this house before is immaterial. I also find the exact placement of the truck to be immaterial as it was behind the house even if to the side rather than directly behind. This objection is overruled.

[7] Defense Exhibit 7 speaks for itself. That exhibit does appear to show that officers did not enter any other rooms in the residence, but stayed in the main living area with the three occupants. The objection is sustained to the extent it seeks to make this point. It is overruled to the extent it suggests the officers' conduct was insufficient to secure the residence as Miller did not present any evidence on that point.

[8] This objection sustained. All witnesses except Ms. Miller said they saw Miller holding a gun, but not all witnesses said they saw him holding the gun "when he exited his residence." *See* Doc. No. 57 at 8. This distinction has little, if any, relevance however as all witnesses except Ms. Miller saw Miller with the shotgun shortly after exiting his apartment.

[9] *See supra,* note 3.

where Latham's deck is or the side of the house, where Miller's truck was located.[10]

- With regard Ms. Cole's statement, all her observations were from inside the apartment from the enclosed porch at the front of the residence. At about the 2:00 mark in the video of her statement she states she could see through the glass door on the porch and that Latham and Mr. Cole were with her inside the porch. She also said that Borntreger was outside in her car. Cole did say as "they" were coming back in the house, Miller went upstairs. This means that Latham and Mr. Cole were coming back into the house from the enclosed front porch.[11]

*See* Doc. No. 62-1 at 35-38, n.i. I do not find that any of Judge Roberts' findings of fact are unsupported by the record and do not find that they need to be modified based on Miller's objections, except as noted. I will take those factual objections into account in discussing Miller's legal objections and will discuss them in greater detail below to the extent I find they are relevant.

**B.    *Objections to Conclusions of Law***

**1.    *Motions to Suppress***

**a.    Franks *Hearing***

Miller argues he is entitled to a *Franks* hearing because of "the highly relevant nature of the information that Officer Bovy omitted" from the warrant application and the last paragraph in the application, which suggests that Borntreger and Ms. Cole saw Miller point a gun at Latham, when their statements contradict that. *See* Doc. No. 62-1 at 10. He objects to any findings in the R&R to the contrary and contests the finding that the omitted information did not make the affidavit misleading. Miller alleges the police deliberately omitted facts with reckless disregard of whether they made the affidavit misleading and that they should have left it to the judge to make credibility

---

[10] *See supra*, note 3.

[11] *See supra*, note 3.

determinations. He contends the omitted information undermined a finding of probable cause. Miller also objects to the procedure used by Judge Roberts in taking evidence, but later determining Miller was not entitled to a *Franks* hearing. I will address the procedural issue first.

Judge Roberts stated at the hearing that he had doubts whether Miller had made a sufficient showing entitling him to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Over the Government's objection, he decided that he would take up all the evidence at the hearing, hold a *Franks* hearing and then determine whether Miller was entitled to the *Franks* hearing. *See* Doc. No. 57 at 15. He notes Miller incorrectly interpreted this to mean that he had satisfied the burden that he was entitled to a *Franks* hearing. *Id.*

Miller argues in his objections that Bovy and Thomas testified at the hearing and the prosecution presented evidence regarding the omissions from the warrant application. Doc. No. 62-1 at 11. Miller contends that if a *Franks* hearing was held, then that must mean he was entitled to one. He argues that if Judge Roberts intended to conduct a "pre-*Franks*" hearing, he should not have given the Government an opportunity to present evidence on the validity of the warrant. *Id.* at 12 (citing *United States v. McMurtrey*, 704 F.3d 502 (7th Cir. 2013)). He contends that he met the *Franks* standard by proving evidence was omitted from the warrant application that the judge needed to evaluate the credibility of Latham's claims and that such evidence was necessary to the probable cause finding. *Id.* at 13.

To be entitled to a *Franks* hearing, a defendant must make "a substantial preliminary showing that a false statement [or omission] knowingly and intentionally, or with reckless disregard for the truth, was included [or omitted] by the affiant in the warrant affidavit" and that "the allegedly false statement [or omission] is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. In *McMurtrey*, the Seventh Circuit acknowledged that it is sometimes difficult to determine whether a defendant has made a sufficient preliminary showing under *Franks*. *McMurtrey*, 704 F.3d at 509.

Therefore, it stated that courts may utilize "pre-*Franks*" hearings to give defendants "opportunities to supplement or elaborate on their original submissions." *Id.* The Seventh Circuit emphasized that a pre-*Franks* hearing should not allow the Government to present new evidence to explain any discrepancies identified by the defense without giving the defense the opportunity to challenge or rebut the evidence. *Id.* It noted that the Government is entitled to present evidence and the defendant cross-examine that evidence in a full *Franks* hearing. *Id.* The important part is that the court not rely on new evidence from the Government in determining whether the defendant has made his substantial preliminary showing under *Franks*. *Id.* at 510.

Here, Judge Roberts noted that he was on the fence about whether Miller was entitled to a *Franks* hearing. Doc. No. 63 at 2. However, he stated he would make that decision after he had heard all of the evidence and noted that he would hear evidence with respect to all motions together. *Id.* After admitting the parties' exhibits, the hearing proceeded with testimony from Government witnesses. Miller was allowed to cross-examine all witnesses. Judge Roberts occasionally cited Bovy's testimony in analyzing whether Miller was entitled to a *Franks* hearing. *See* Doc. No. 57 at 17-27. He noted that Bovy acknowledged that Thomas was the officer who spoke with Borntreger and Cole rather than himself, *see id.* at 19, that Bovy sometimes has difficulty persuading witnesses to provide him information (particularly when firearms are involved), *id.* at 22 and that Bovy believed he was investigating an assault with a shotgun at the time he applied for a search warrant. *Id.* at 26.

Even if it was improper for Judge Roberts to hear evidence from the Government prior to determining if Miller met his initial evidentiary burden, I find that he did not rely on evidence from the Government used to "bolster" its affidavit in concluding that Miller did not make the required substantial preliminary showing and was not entitled to a *Franks* hearing. *See McMurtrey*, 704 F.3d at 513-14 (concluding it was "impossible to resolve the officers' factual contradictions as set forth in their conflicting warrant affidavits without improperly relying on the bolstering information" that the Government

presented during the pre-*Franks* hearing).  To the extent any of the Government's evidence could be considered as "bolstering" the affidavit, such evidence consists of (1) Bovy's explanation that the "I" with regard to Borntreger's and Ms. Cole's statements is actually Thomas and Thomas was the one who wrote that statement and (2) that he did not believe the other individuals he spoke with (Latham's daughter, her aunt, Johnson) had relevant information.  *See* Doc. No. 63 at 10, 13.  As explained below, Judge Roberts did not rely on this evidence from the Government in determining that Miller failed to make the necessary substantial preliminary showing that Bovy (1) knowingly and intentionally included a false statement or made an omission or did so with reckless disregard for the truth or that (2) the allegedly false statement or omissions were necessary to the finding of probable cause.  As such, any procedural error by Judge Roberts in hearing the Government's evidence before making the *Franks* determination is harmless.  *See United States v. Arnold*, 725 F.3d 896, 900, n.3 (8th Cir. 2013) ("We can find no instance where the district court relied on any information other than the search warrant affidavit and [defendant's] own affidavit detailing the alleged misrepresentations and omissions."); *United States v. Graf*, 784 F.3d 1, 7 (1st Cir. 2015) (concluding that even if the magistrate judge erred in considering evidence from the Government, the district court did not err in denying a *Franks* hearing because defendant failed to make the initial substantial preliminary showing).

Judge Roberts noted that under *Franks*, a defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause."  *Franks*, 438 U.S. at 155-56.  He then considered the alleged false statements in Bovy's affidavit in support of the search warrant.  Miller argued that the last two paragraphs of the affidavit, "when read together, are materially false or misleading."  Doc. No. 57 at 18 (citing Doc. No. 11-2 at 3).  The last two paragraphs provide:

> Officer Thomas with the Waterloo Police Department spoke with Takeela Latham who advised while at her home at 1005 W. Mulan, she walked out of her residence and noticed a suitcase on her deck. Latham advised she did not put the item there and knew her upstairs neighbor Levi Miller has placed items on the deck before with her permission. Latham advised her friend Jarrell Cole to take the suitcase and place it in Levi Miller's truck that was located in the parking area of the apartment. Latham then advised she heard someone coming down the stairs from the upstairs apartment. Latham advised she turned to see Defendant walking with a shotgun in his hands and cursing. Latham advised Defendant pointed the gun at her and Jarrell Cole. Latham described the gun as having a black barrel and wood along the stock. Latham advised herself and Jarrell Cole ran back into their apartment.
>
> I spoke with witnesses Kayla Borntreger and Chelsea Cole who were also on scene as the incident unfolded. Chelsea Cole and Kayla Borntreger advised the gun was black in color and had wood coloring around the stock. Kayla Borntreger and Chelsea Cole advised Defendant as wearing a red shirt and having dreads in his hair pulled back into a pony tail.

*Id.* (citing Gov. Ex. 1 at 4). Judge Roberts noted that the only false affirmative statement Miller could point to was Bovy's assertion that he, rather than Officer Thomas, spoke with Borntreger and Ms. Cole.[12] *Id.* Judge Roberts found that this false statement ("I spoke with witnesses Kayla Borntreger and Chelsea Cole . . . .") did not give rise to a *Franks* violation. *Id.* at 19.

Judge Roberts also found that any alleged omissions did not entitle Miller to a *Franks* hearing. Miller argued that Bovy recklessly omitted Borntreger's statement that contradicted Latham's claim that Miller pointed a gun at someone. *Id.* at 20 (citing Doc. No. 11-2 at 4). Judge Roberts reasoned the record did not show that Bovy entertained serious doubts as to the truthfulness of his statements or had any obvious reasons to doubt the accuracy of the information he wrote in the affidavit. *Id.* at 21. Finally, Judge Roberts found that Bovy did not act with reckless disregard for the truth when he failed

---

[12] At the hearing, Bovy explained that Thomas was the officer who spoke with Borntreger and Ms. Cole.

to note that Latham's account was inconsistent with the physical layout of the location. He noted that contrary to Miller's argument, Latham's account does not require a direct path between the stairs to Miller's apartment and the back of the residence. *Id.* at 23. He explained that even the mere possibility of a discrepancy would not have caused Bovy to entertain serious doubts about the truthfulness of the statements in the affidavit and there were no obvious reasons for him to doubt the accuracy of the information he put in the application. *Id.*

Judge Roberts explained that even if Bovy intended to mislead the judge or acted with reckless disregard for the truth, Miller was still not entitled to a *Franks* hearing because the false statement was not necessary to the issuing judge's finding of probable cause, nor was the omitted information clearly critical to a finding of probable cause. *Id.* at 24. With regard to the false statement "I spoke with witnesses Kayla Borntreger and Chelsea Cole," Judge Roberts found this was not necessary to the probable cause finding. If the affidavit had correctly stated "Officer Thomas spoke with witnesses Kayla Borntreger and Chelsea Cole," Judge Roberts reasoned the issuing judge's weighing of the facts would not have changed as the false part of the statement did not alter the content of the witnesses' statements and Miller did not offer any reason as to why the issuing judge may have found one officer credible over the other. *Id.* at 25. Moreover, both officers were involved in the investigation.

With regard to the omission of Borntreger's statement that Miller did not point the gun at any of the eyewitnesses and could not see the eyewitnesses, Judge Roberts found this omission was not clearly critical to the probable cause finding. Multiple witnesses observed Miller angry and cursing while carrying a shotgun. Even if Borntreger did not see Miller point the shotgun, the officer could reasonably conclude that Miller had been carrying the shotgun in a threatening manner. Moreover, all of the eyewitnesses except Borntreger saw Miller walk back toward his apartment with the shotgun. Finally, Latham stated that Miller had pointed the shotgun at her. Thus, even if Borntreger's statement that Miller had not seen them had been included, the eyewitness statements as a whole

still would have created a fair probability that evidence of a crime would be found in Miller's residence. *Id.* at 25-26.

With regard to the omitted statements from Latham's daughter, the aunt and Johnson, Judge Roberts found these were also not clearly critical to the probable cause finding. The daughter and aunt stated only that they did not hear any loud noises. Judge Roberts noted that loud noises are not a requirement for the crime Bovy was investigating (displaying a firearm in a threatening manner towards another person). *Id.* at 26. Similarly, Johnson's statement that he heard Miller and his wife arguing is not inconsistent with Latham's report of Miller pointing a shotgun at her. *Id.* at 27.

Finally, with regard to the alleged discrepancy between Latham's statements and the physical layout of the residence, Judge Roberts found this was not clearly critical to the probable cause finding. As noted above, Judge Roberts reasoned that this was not necessarily a discrepancy and even if it was, it would not have necessarily changed the issuing judge's finding of probable cause. *Id.* For these reasons, Judge Roberts concluded Miller was not entitled to a *Franks* hearing.

Miller makes the same arguments in his objections to the R&R. He argues that the affidavit is false and misleading because Bovy admitted at the hearing that he had not spoken to Latham, Mr. Cole, Ms. Cole or Borntreger and did not have first-hand knowledge of what they said. Doc. No. 62-1 at 15. He also argues it was false and misleading not to include information that contradicted Latham's claim that Miller pointed a gun toward her. *Id.* He describes the various discrepancies between the statements and the affidavit and contends Bovy deliberately omitted such information, as well as information that he spoke with Latham's daughter, her aunt and Johnson. *Id.* at 16. He objects to the R&R finding that he did not offer evidence that Bovy omitted information to intentionally mislead the judge and did not do so with reckless disregard for the truth. *Id.* at 18. He contends Bovy admitted at the hearing that he deliberately omitted information from the application if it was inconsistent with the claim that Miller pointed

a shotgun at Latham and argues that the R&R fails to acknowledge this admission. *Id.*[13]

He compares the situation to the one in *United States v. Jacobs*, 986 F.2d 1231, 1234-35 (8th Cir. 1993), in which the officer stated that a drug dog showed an "interest" in a package that was the subject of the warrant, but omitted information that the drug dog did not in fact "alert" to the package. *Id.* The court found that when including the information regarding the failed alert, the application lacked probable cause. *Jacobs*, 986 F.2d at 1235. Miller argues that the omitted facts here are similarly relevant and their omission was either deliberate or with reckless disregard for the truth.

Miller additionally objects to the R&R's discussion of why Bovy had good reason to believe Latham, despite "substantial evidence" that she was not credible. Doc. No. 62-1 at 19. He contends the issuing judge for the warrant should have been provided all relevant information to assess Latham's credibility. *Id.* at 19-20 (citing *United States v. Glover,* 755 F.3d 811, 814 (7th Cir. 2014)). Under *Glover*, Miller argues that affidavits for warrants based on informants are highly fact-specific and that information about the informant's credibility or potential bias is crucial. *Glover*, 755 F.3d at 816. Miller

---

[13] I have read the transcript from the hearing and do not find any such admission. Bovy stated Thomas did not tell him anything about the interviews with Ms. Cole or Borntreger that he thought was necessary to include or that he intentionally left out of the warrant. He also testified he did not intentionally leave anything out that he thought could result in the warrant going unsigned. *See* Doc. No. 63 at 12. When asked why he did not include the information about Latham's daughter, the aunt or Johnson, Bovy testified they had stated they were not a part of it and did not know what was going on. *Id.* at 15-16, 19. Bovy testified he also did not know that Borntreger had said Miller did not see Latham because Thomas drafted the part of the affidavit concerning Borntreger's and Ms. Cole's statements. *Id.* at 16. Bovy stated that in drafting the warrant he did not include every single fact they knew, but had to make a selection of the relevant facts that he thought were relevant to the case to put in the application and did not put in or leave out anything with the intent to deceive or mislead the judge. *Id.* at 19. In any event, such evidence was not submitted by Miller as part of his preliminary showing in support of a *Franks* hearing. The testimony from the hearing would be considered "bolstering" evidence by the Government. Because Miller did not rely on such evidence in making his preliminary showing, I find it is inappropriate to consider this evidence in determining whether Miller is entitled to a *Franks* hearing. The only evidence Miller provided was that Bovy did not talk to Ms. Cole and Borntreger. *See* Doc. No. 11-2 at 3-4. He failed to show that the word "I" in the affidavit was anything beyond negligence.

argues Bovy should have included information in the affidavit that Latham claimed she did not like Miller and had an ongoing dispute with him. He argues Bovy also failed to inform the judge about Latham's statements concerning where she was and statements from other witnesses that contradicted Latham's. *Id.* at 21.

Finally, Miller objects to the R&R's findings that Latham's claim (as set forth in the affidavit) would constitute an assault and give rise to the search of Miller's apartment for the firearm independent of her claim that Miller pointed the shotgun at her. *Id.* He also objects to the finding that even if the omitted information had been presented to the judge, the eyewitness statements still would have created a fair probability that Miller had committed an assault and that evidence of the crime would be found in his apartment. *Id.* at 22. Miller argues that because Bovy deliberately withheld information about where Latham was and what Miller did, both of Latham's claims (that Miller had a gun and was yelling and that Miller pointed the gun at her) should be excised from the affidavit.

He adds these claims should be stricken for the additional reason that Borntreger stated that Miller did not even see Latham, let alone point a gun at her. *Id.* Additionally, Bovy failed to advise the judge that Borntreger said they were all inside the apartment when Miller walked by with a gun. He contends this is consistent with Ms. Cole's statement that Latham was inside the apartment on the porch.[14] He also notes Bovy should have informed the judge that the stairs to Miller's apartment are in the front of the house, not the back of the house where Latham claimed to be, and thus, she would not have been able to see him coming down the stairs.[15] *Id.* at 23. Miller argues the last paragraph from the affidavit should also be stricken because it suggests that Borntreger

---

[14] Ms. Cole did not say Latham was inside, but that "they" were outside. Def. Ex. 2, video of Ms. Cole. She was asked who was with her and she named Latham, Mr. Cole and Borntreger, but did not clarify where they were in relation to her. She also stated "as they were coming back in the house" Miller went upstairs. *Id.*

[15] Government Exhibit 3 shows the stairs do not have risers or are slatted such that a person is able to see through them from the back of the house. *See* Doc. No. 50.

and Ms. Cole supported Latham's claim that Miller pointed the gun at Latham. Without this information and Latham's claims excised from the affidavit, Miller argues there is no probable cause. He adds the fact that Borntreger, Ms. Cole and Mr. Cole all saw Miller yelling with a gun is insufficient to believe that Miller committed a crime. *Id.* at 24 (citing Iowa Code § 708.1 providing that an assault occurs when a person "intentionally points any firearm toward another, or displays in a threatening manner any dangerous weapon toward another.").

I agree with Judge Roberts' *Franks* determination. The misstatement about who spoke with Borntreger and Ms. Cole is a minor discrepancy that does not warrant a *Franks* hearing. *See United States v. Coleman*, 349 F.3d 1077, 1084 (8th Cir. 2003) ("A 'minor discrepancy' in the wording of an officer's statement is not sufficient under *Franks* to establish that the officer acted deliberately or recklessly in making the statement."). Miller did not make a substantial preliminary showing that Bovy knowingly and intentionally included that statement or did so with reckless disregard for the truth. Even if Miller could make such a showing, the correction[16] of who spoke with the witnesses is not necessary to the probable cause finding as it does not change the content of the witnesses' statements, and, as Judge Roberts noted, there is no evidence that one officer could be considered more credible over the other.

With regard to the omissions concerning (1) inconsistencies between Borntreger's and Latham's statements, (2) Latham's account of the physical layout of the location and (3) the information from other residents of the apartment building, I do not find Miller has shown this information was intentionally omitted or omitted with reckless disregard for the truth or that it is material or critical to the probable cause determination. Miller's

---

[16] Miller is incorrect that the whole second paragraph should be stricken to analyze whether there is probable cause. Only the false information need to be excised or corrected – in this case the "I." *See United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (noting the second requirement of a *Franks* hearing is a showing that "if the false information is excised" the affidavit no longer establishes probable cause).

only evidence on this point prior to the hearing were the statements themselves. He did not produce any evidence that Bovy knew about the substance of the four witness statements, let alone any inconsistencies. To the extent the omissions could be deemed to have been made in reckless disregard for the truth, they do not meet the second step of being critical to the probable cause determination. None of the omissions have any bearing on the witnesses' consistent statements that Miller came to the back of the house in response to Latham and Cole moving the bag to his truck, holding a shotgun in a threatening manner and repeatedly saying "motherfuckers." Any discrepancies regarding where they made this observation and whether they aligned with the physical layout of the building are minor and extraneous.

All witnesses described being outside and, at some point, going inside Latham's apartment after Miller exited his apartment. The precise timing is not necessarily relevant except to the fact of whether Miller pointed the gun at Latham and allegedly committed an assault. Latham explained that when Miller "turned the corner" and came walking toward the truck, she saw him holding the shotgun saying "these motherfuckers" at which point she and Mr. Cole went into her apartment. She stated as he "came down" he had the gun pointed at them. Notably, she did not say down the stairs, and could be referring to Miller walking down the side of the house towards the truck. Mr. Cole's account of the incident largely corroborates Latham's in that he saw Miller with the shotgun saying "motherfuckers" at which point they went into Latham's apartment. Ms. Cole states that "they" were outside (presumably referring to Mr. Cole and Latham) and she was on her way out when she saw Miller standing there with a gun in his hands. She stated she could not tell where he came from because she was not outside then. She stated she could see everything through the glass door on the porch. It makes sense that Ms. Cole did not see Miller point the gun at anyone since Mr. Cole and Latham were coming back to the apartment by then. Ms. Cole also corroborates Latham's recollection that Borntreger was in the car. Borntreger's recollection of the events is slightly different. She stated that Mr. Cole and Latham put the bag in the truck and came back in the apartment when

they heard Miller coming down the stairs. She stated all of them stayed in "the front doors" so they could see. Then, "they came out" and that is when she and the others saw Miller with the gun walking to the back of the house. After a few minutes in the back, they saw him walk back around the house. Borntreger stated he did not see them and they were watching from the front porch window. Notably, all witnesses had similar descriptions of the gun, the people involved and the general chain of events.

Even if I found the discrepancies in the witness statements were intentionally omitted or omitted with reckless disregard for the truth, this would not require excising Latham's claims to determine whether the omissions impacted the probable cause analysis as Miller argues. Rather, I must consider whether the affidavit was supported by probable cause if the omitted information *had been included*. *See United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007) (noting that where a probable cause determination was premised on an affidavit containing false or omitted statements, the resulting search warrant may be invalid if the defendant can prove by a preponderance of the evidence "(1) that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading . . . and (2) that the affidavit, if supplemented by the omitted information would not have been sufficient to support a finding of probable cause."); *Hunter v. Namanny*, 219 F.3d 825, 830 (8th Cir. 2000) ("a reconstructed affidavit must also include material allegedly omitted with reckless disregard for the truth."). If the information concerning the full extent of statements from Latham, Borntreger, Ms. Cole and Mr. Cole had been included in the affidavit, as well as information concerning the layout of the apartment and the location of Miller's stairs, I do not find that such information would render the affidavit unsupported by probable cause.

"The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit." *United States v. Notman*, 831 F.3d 1084, 1088 (8th Cir. 2016) (quoting *United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir. 1982)). Latham was the alleged victim in the case, not a

mere informant. *See United States v. Wallace*, 550 F.3d 729, 734 (8th Cir. 2008) ("Not only is more weight given to information where officers meet face-to-face with the informant and judge her to be credible, but law enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication the information is not reasonably trustworthy or reliable."). It would have been reasonable for the issuing judge to believe her statement over Borntreger's or that evidence of a possible crime would be found in Miller's apartment even if the events (as recalled by one witness) did not precisely match up with the particular crime the officers believed they were investigating. Probable cause requires only a showing of facts "sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." *United States v. Wells*, 223 F.3d 835, 838 (8th Cir. 2000). *See also United States v. Multschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010) ("An affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched.") (cleaned up). Probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (citation omitted). For these reasons, Miller's objections as to the *Franks* hearing are overruled.

### b.      *Entry Into Defendant's Residence*

Miller objects to Judge Roberts' finding that exigent circumstances justified the warrantless entry into his residence before the warrant was obtained. He contends the officers' purported concerns of safety and other people being in the apartment are inconsistent with the officers' conduct because they did not go room to room checking for other individuals. He also argues that the exigency of possible destruction of evidence is inapplicable because a shotgun is not the type of evidence that can be destroyed. Because the firearm was seized after the warrant had been obtained, Miller argues that

the "fruit" from the warrantless entry that should be suppressed includes observations made by police about what Miller, his wife and Randall said or did during the time the police entered the residence and waited for the warrant and what the police saw during this time. *See* Doc. No. 62-1 at 27.

Judge Roberts concluded that warrantless entry into Miller's residence was allowable because exigent circumstances created a concern for officer safety. Doc. No. 57 at 28-29. He reasoned that law enforcement was dispatched to 1005 West Mullan Avenue in response to a report that Miller was displaying a shotgun in a threatening manner. He concluded this environment would make a reasonable, experienced police officer concerned for his or her safety. *Id.* at 29. He noted that securing the residence from the outside did not alleviate this concern because the alleged firearm could have been used offensively from the interior of the residence or against people inside the residence. Moreover, Bovy's testimony and Defense Exhibit 7 show that law enforcement on the scene were aware of a prior incident in which officers found a bomb at Miller's residence. *Id.* at 29-30.

Judge Roberts also concluded that the potential destruction of evidence was another exigent circumstance that justified the warrantless entry. He reasoned that officers had reason to be concerned that Miller would destroy, dismantle or hide the shotgun. *Id.* at 30. After Miller denied the officers entry, they informed him that they were seeking a search warrant. Judge Roberts acknowledged that the exigency of possible "destruction" of a shotgun is much different than the possible destruction of drugs (such as flushing them down the toilet), but reasoned that a person could dismantle or break down a shotgun and hide the parts. *Id.*

Finally, Judge Roberts reasoned that the inevitable discovery doctrine applied to the shotgun evidence because law enforcement did not exploit their presence while in the residence and the firearm was discovered only after the officers had obtained and served the signed search warrant. *Id.* at 31. He concluded the officers' protective sweep of Miller's residence was much less invasive than those in other cases in which courts found

the officers' conduct rose "to the level of offensiveness" and did not apply the inevitable discovery doctrine to the warrantless search. *Id.* at 32 (citing *United States v. Madrid*, 152 F.3d 1034, 1041 (8th Cir. 1998)).

"Warrantless searches inside a home are 'presumptively unreasonable,' but not if 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *United States v. Quarterman*, 877 F.3d 794, 797 (8th Cir. 2017) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). An objectively reasonable belief of a threat to officer safety is a recognized exigency. *Id.* (citing *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003)). "The presence of a weapon in a home does not necessarily constitute exigent circumstances." *Id.* (citing *United States v. Murphy*, 69 F.3d 237, 243 (8th Cir. 1995)). However, the Eighth Circuit has recognized that the presence of non-law enforcement persons at the scene creates a legitimate risk that unsecured firearms could be used improperly to inflict harm. *United States v. Prather*, 138 F. Supp. 3d 1059, 1066 (S.D. Iowa 2015) (citing cases); *see also United States v. Carlton*, 682 F. App'x 242, 243 (4th Cir. 2017) ("[P]olice officers need to be assured that the person with whom they are dealing are not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against [them]."(quoting *United States v. Watson*, 703 F.3d 684, 693 (4th Cir. 2013))). The risk that evidence will be destroyed during the time required to obtain a search warrant is also a recognized exigent circumstance justifying warrantless entry. *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005).

I find the exigent circumstance of officer safety concerning other occupants who may have been in the apartment along with the suspected presence of an unsecured firearm in the apartment justified the warrantless entry. As Judge Roberts noted, the officers were at Miller's apartment to investigate a report that had been made that night of Miller displaying a firearm in a threatening manner. *See Quarterman*, 877 F.3d at 798 ("[T]his court has consistently found exigent circumstances where officers

reasonably believe a gun or an armed individual presents a danger to others or themselves."); *United States v. Lopez*, 989 F.2d 24, 26 (1st Cir. 1993) (concluding exigent circumstance of officer safety was present where police had reason to believe that defendant had sawed-off shotgun nearby, which had been used only shortly before to threaten someone). Officers' contact with Miller did nothing to alleviate any threat of danger to officers or others. While speaking with officers, Miller repeatedly referred to an incident when a bomb was found at his residence and he had allegedly been beaten up by law enforcement officers in a cornfield. He insinuated that police had planted items in his home and Bovy formed the impression that Miller disliked law enforcement. *See* Doc. No. 57 at 29-30; Doc. No. 63 at 10; Def. Ex. 7 at 3:00-3:32, 3:57-4:06; 26:20-38.

With regard to Miller's argument that the concern of other occupants in the residence with the firearm was pretext given that the officers did not conduct a full search of every room in the apartment once they entered, Bovy testified that he believed the other rooms were visible from the area where the officers stayed with Miller, Ms. Miller, and Randall. Doc. No. 63 at 18. Government's Exhibit 3 also confirms that the interior of other rooms in the apartment can be viewed from the main living area. *See* Doc. No. 50. I decline to second-guess the necessary scope of a protective sweep under these circumstances. It is apparent that the officers' main concern was that none of the occupants accessed a firearm that was believed to be in the apartment. Moreover, the need or lack of need for a protective sweep could not be assessed until *after* the entry and officers were able to assess the situation, along with any further safety concerns regarding access to a firearm.

With regard to the potential destruction of evidence, this exigency is clearly less strong. However, based on the officers' interaction with Miller at the entryway to the apartment, it was reasonable to believe that Miller or others may have tried to tamper with or hide the shotgun had they been allowed back into the residence unaccompanied by law enforcement while officers secured a warrant. Miller, his wife and Randall were aware that officers wanted to search the residence for a shotgun. On Defense Exhibit 7,

Ms. Miller can be heard saying "no, we have the long one" in response to Miller's statement that a stick is the only thing they have resembling a gun. *See* Def. Ex. 7 at 2:00-2:13. Miller responded that he had put "those bullets" and "both of those" in the truck the other day when he was packing. *Id.* at 2:13-2:20. Ms. Miller then stated "the one that bends in half does look like a shotgun." *Id.* at 2:20-2:24. She denied that the BB gun they have was carried downstairs. *Id.* at 2:34-2:37. While the potential destruction of evidence was perhaps not as imminent[17] as in other cases, it was reasonable for officers to believe based on the totality of the circumstances that the occupants may have destroyed or tampered with evidence had they retreated into the residence out of sight of law enforcement. *See United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (concluding warrantless entry was justified where residents witnessed evasive behavior such as consulting one another and feigning confusion which appeared to be a delaying tactic and during which one the residents took bags to the kitchen sink and started disposing of their contents). This exigency was clearly a secondary concern to the concern for officer safety. Nonetheless, I find that it was an additional basis for entering the apartment until a warrant could be obtained. For these reasons, Miller's objections related to the warrantless entry are overruled.[18]

### c.      *Seizure of the Shotgun*

Miller objects to the R&R's conclusion that the seizure of the shotgun was proper under the search warrant. Specifically, he challenges whether it was "immediately

---

[17] *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("law enforcement officer may make a warrantless entry onto private property . . . to prevent the imminent destruction of evidence.").

[18] Even if these exigent circumstances do not apply, I agree with Judge Roberts' analysis that the inevitable discovery doctrine would apply to prevent suppression of the shotgun. Miller makes no objection to that analysis and, as noted above, does not argue that the shotgun was fruit of the warrantless entry.

apparent" that this was the firearm law enforcement was looking for. Doc. No. 62-1 at 27-28 (citing *Horton v. California*, 496 U.S. 128, 136 (1990)). He argues that the gun was a different size and color than the gun Latham claimed Miller possessed. He contends that Thomas (who discovered the gun) had no information that Miller knew the gun was in the residence and that Thomas arguably should have sought another warrant before seizing the gun. *Id.* at 28 (citing *Messerschmidt v. Millender*, 565 U.S. 535 (2012)). Depending on whether officers knew Miller was a felon at the time they found the gun, Miller argues that the absence of this knowledge would be another reason that the incriminating nature of the shotgun in the house was not immediately apparent. He argues that there was little information to believe that he illegally possessed any weapon other than what the judge authorized the officers to seize – a black, long-barrel shotgun or shotguns. *Id.* at 29.

Judge Roberts noted that warrant described the property to be seized as "[a] long barrel firearm described as a shotgun with a black barrel and brown colored stock, shotgun ammunition, and any other long barrel firearm." Doc. No. 57 at 33 (citing Gov. Ex. 1 at 1). Judge Roberts noted that the seized shotgun has a barrel length of 17-7/8 inches, making it a short-barreled shotgun under 18 U.S.C. § 921(a)(6) (defining a short-barreled shotgun as "a shotgun having one or more barrels less than eighteen inches in length and any weapon made from a shotgun . . . if such a weapon as modified has an overall length of less than twenty-six inches"). *Id.* Judge Roberts reasoned that although the shotgun does not exactly match the description in the warrant, the difference is not significant enough to make the seizure unconstitutional. *Id.* He noted the officers acted reasonably and in good faith when they seized the shotgun and, prior to Special Agent Saunders' report, they did not know whether the shotgun was a short-barreled shotgun. *Id.* at 34. He stated that one-eighth of an inch is a difference that an officer acting in good faith would reasonably be unable to perceive.

I agree with Judge Roberts' analysis. Miller's suggestion that officers should have been able to perceive one-eighth of an inch difference in the barrel length is unpersuasive,

as are his arguments that the firearm was covered by a T-shirt such that an officer would not be able to tell if it was the item they were looking for and that it did not have a black barrel. "[T]he requirement that a search warrant describe its objects with particularity is a standard of 'practical accuracy' rather than a hypertechnical one." *United States v. Peters*, 92 F.3d 768, 769-70 (8th Cir. 1996) (quoting *United States v. Lowe*, 50 F.3d 604, 607 (8th Cir. 1995)). "The constitutional standard for the particularity of a search warrant is that the language must be sufficiently definite to enable the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992) (citing *Steele v. United States*, 267 U.S. 498, 503-04 (1925)).

Miller cites *Messerschmidt* for the proposition that officers should have sought another warrant upon discovering the firearm in the kitchen and that officers had no information that Miller illegally possessed any weapon other than the one authorized to be seized in the warrant. *Messerschmidt* involved an allegedly-overbroad warrant that authorized seizure of "all guns" in addition to a gun that was described with particularity that had allegedly been used in an assault as well as evidence related to gang membership. *Messerschmidt*, 565 U.S. at 541-42. The Court held that even if the scope of the warrant was overbroad, it was not entirely unreasonable for officers to believe that there was probable cause to search for all firearms, firearm-related materials and evidence of gang membership under the circumstances of the case. *Id.* at 549-52. The warrant in this case described the particular firearm that had allegedly been used and "any other long barrel firearm." To the extent Miller argues the warrant was overbroad, I disagree. All witnesses described Miller holding a long-barrel firearm, but their descriptions of it differed slightly. The warrant did not authorize search and seizure of any unrelated items.

To the extent Miller argues the seized shotgun falls outside of the property described in the search warrant, I also disagree. Such an exacting level of precision between the seized property and described property is not required under the law. *See*

*Peters*, 92 F.3d at 769-70 (noting particularity is a standard of "practical accuracy" and is not hypertechnical). The fact that it did not turn out to be a long-barrel shotgun also does not change the analysis given that the difference was one-eighth of an inch. Under *Messerschmidt*, it was reasonable for officers to believe that the warrant authorized seizure of the firearm discovered in the kitchen and it was unnecessary to procure a second warrant. The shotgun was properly seized pursuant to the search warrant.

I also agree with Judge Roberts that seizure of the shotgun was appropriate under the plain view doctrine. *See* Doc. No. 57 at 35-36. Miller does not appear to make any specific arguments related to this aspect of the R&R, except to suggest that the shotgun's incriminating character was not "immediately apparent." Doc. No. 62-1 at 28. I disagree. Whether based on the T-shirt thrown over the firearm or the slight differences between the description and actual appearance, I find these are insufficient reasons to hold that the seizure of the shotgun was unconstitutional. As Judge Roberts noted, the shotgun was found in the place authorized to be searched and in an area of the house that could hold a long gun. Thomas testified that even though the barrel of the gun was partially covered by a T-shirt, he could see the butt of the gun and could tell it was a shotgun. *See* Doc. No. 63 at 24. For all of these reasons, the incriminating character of the shotgun was immediately apparent. Miller's objections related to the seizure of the shotgun are overruled.

### 2.    *Motions to Dismiss*

Miller objects to the finding in the R&R that the relevant statutes provide fair notice of what is prohibited conduct. Doc. No. 62-1 at 30. He also objects to the conclusion that the Second Amendment does not protect his possession of the shotgun at issue and that the National Firearms Act is constitutional under the Second and Ninth Amendments.

### a.    *Lack of Proper Notice*

Miller argues that neither 26 U.S.C. § 5845(a)(1) nor 18 U.S.C. § 921(a)(6) define how to measure the length of the barrel of a shotgun.  Doc. No. 62-1 at 30.  While he acknowledges that the regulations describe how to measure the length of a barrel, he argues they do not adequately define how to measure the barrel of a shotgun that is not uniform in length.  *Id.*

Judge Roberts noted that the ATF agent's report and photographs, *see* Doc. No. 43, show that the shotgun barrel is, at all points, less than eighteen inches in length even though it varies slightly because of the way it appears to have been cut.  *See* Doc. No. 57 at 38.  He noted that the Eighth Circuit has not addressed whether 26 U.S.C. § 5845(a)(1) and 18 U.S.C. § 921(a)(6) provide fair notice as to prohibited activities, but that the Seventh, Ninth and Eleventh Circuits have upheld the measurement methods prescribed in those statutes and the implementing regulation – 27 C.F.R. § 479.11.  *Id.* at 38-39 (citing *United States v. Calise*, 996 F.2d 1012, 1022 (9th Cir. 1993); *United States v. Griffin*, 705 F.2d 434, 436 (11th Cir. 1983) and *United States v. Lim*, 444 F.3d 910, 916 (7th Cir. 2006)).  He explained that a statute provides fair notice when the statute "define[s] the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement."  *Id.* at 39 (quoting *Skilling v. United States*, 561 U.S. 358, 402-03 (2010).  Judge Roberts pointed out that the shotgun barrel at issue is less than eighteen inches even at its longest point.  *Id.* at 39-40 (citing Gov. Ex. 9 at 14).  He concluded § 5845 provided Miller with adequate notice as to what is prohibited because the statute "supplies the specific measurements that will bring a shotgun within the proscribed zone."  *Id.* at 40 (quoting *Lim*, 444 F.3d at 916).  Based on the similarities between § 5845(a)(1) and § 921(a)(6), he concluded that § 921(a)(6) also provides fair notice that possession of the shotgun seized from Miller's residence was an illegal act. *Id.*

I agree with this analysis. Miller's argument would be persuasive only if some part of the shotgun barrel was at least 18 inches long. However, as demonstrated by Government Exhibit 9 (Doc. No. 43) no part of the barrel reaches 18 inches. For the reasons described by Judge Roberts, I agree that sections 5845(a)(1) and 921(a)(6) provide fair notice of the prohibited action. Miller's objection related to the lack of proper notice is overruled.

### b.     *Second and Ninth Amendments*

Miller objects to the R&R's conclusion that the Second Amendment does not protect possession of the shotgun at issue (having a barrel less than 18 inches long). He does not offer any specific argument as to why the R&R was wrongly decided, but objects to preserve the issue for appeal. *See* Doc. No. 62-1 at 31. With regard to the Second Amendment, Miller argues that under *District of Columbia et al. v. Heller*, 554 U.S. 570 (2008), he was entitled to have a firearm in his residence for purposes of self-defense. *Id.* at 32. Miller also argues that the National Firearms Act (which includes the statutes cited in the Indictment) is unconstitutional because "it usurps the power reserved to a state in violation of the 2nd and 9th Amendments." *Id.* Therefore, he argues Count 1 should be dismissed. While he acknowledges that *United States v. Miller*, 307 U.S. 174 (1939), holds otherwise, he objects to preserve the issue. *Id.* at 33.

Judge Roberts concluded possession of a short-barreled shotgun is not afforded Second Amendment protection, noting that *Heller* specifically identified "short-barreled shotguns" as firearms that do not receive Second Amendment protection. Doc. No. 57 at 40. He also cited *Miller*, noting that it precludes Miller's argument that the National Firearms Act is unconstitutional as usurping police powers reserved to the states. *Id.* at 41.

I agree that under current Supreme Court precedent, Miller's possession of a short-barreled shotgun is not protected by the Second Amendment and the National Firearms

Act is not unconstitutional under the Second or Ninth Amendments. Miller's objections related to the Second and Ninth Amendments are overruled.

### c.    *Grand Jury Misconduct*

Miller does not object to Judge Roberts' conclusion that the way the grand jury proceedings were conducted do not warrant dismissal of the charges in the Indictment. Doc. No. 62-1 at 34. I have reviewed this issue for clear error and agree with the reasons provided by Judge Roberts that the grand jury proceedings do not provide a basis for dismissal of the Indictment. *See* Doc. No. 57 at 41-42.

## IV.    CONCLUSION

For the reasons set forth herein:

1.    Miller's objections (Doc. No. 62) to the R&R (Doc. No. 57) are **overruled**;

2.    I **accept** Judge Roberts' R&R (Doc. No. 57) **without modification**;

3.    Pursuant to Judge Roberts' recommendation, Miller's motion (Doc. No. 11) to suppress/request for *Franks* hearing, motion (Doc. No. 12) to suppress, motion (Doc. No. 14) to dismiss and second motion (Doc. No. 17) to dismiss are **denied**.

**IT IS SO ORDERED.**

**DATED** this 27th day of December, 2019.

_____
Leonard T. Strand, Chief Judge